## Court of Appeals.

Jan. 17, 1893.

### PEOPLE v. HUGHES.

(50 St. Rep. 62; 137 N. Y. 29.)

1. EXTORTION—FELONY.
   Extortion is a felony under the definition of the Penal Code.
2. JURY—PEREMPTORY CHALLENGES.
   Where the counsel for the defendant concedes that the court has discretion to permit a peremptory challenge of a juror after he has been sworn, it is no abuse of discretion to give the permission so to do upon the assurance of the prosecuting officer.
3. OBJECTION—SPECIFIC.
   An objection must be sufficient to call fairly the attention of the court to the precise point to be decided, and must be specific and must not be ambiguous and misleading.
4. CONSPIRACY—BOYCOTT.
   One may refuse to deal with a firm because of a conviction that it does not

give honest compensation for labor and may ask his friends or the public to do the same thing, and the conduct may produce injury to the business criticised without thereby becoming illegal.

5. SAME.

But where, on the other hand, one influences his friends and the public to inflict the same injury of withdrawal of custom without just or excusable reason and by fraudulently concealing the fact that it does not, and pretend ing that it does, exist, and using official power and influence to make effective the deception and to force and compel unwilling dealers to desist from their purchases and that for the sole purpose of extorting money, then the resultant injury will be unlawful.

6. CRIMINAL LAW—REASONABLE DOUBT.

A reasonable doubt cannot be said to exist where the jury are so firmly convinced of the facts necessary fo establish the prisoner's guilt that, if it was a very grave and serious matter affecting their own affairs, they would not hesitate to act upon such conviction.

Appeal from a judgment of the general term of the supreme court, fifth department, affirming judgment of conviction at oyer and terminer, entered upon the verdict.

John Van Voorhis, for appellant.

William F. Cogswell, for respondents.

FINCH, J.—The prisoner was convicted of extortion. The verdict of the jury establishes that, availing himself of his position as the head of a labor organization, with branches in almost all sections of the country, he first threatened and then put into operation a scheme for lessening and damaging, and to some extent destroying the business of a firm of clothing manufacturers because they did not at once obey his demands in respect to the number of apprentices they should employ; and, when they submitted to his dictation and apologized for seeking to do their own business in their own way instead of his, extorted money from the firm as the price of forgiveness. Setting in motion the enormous power which the organization, evidently misjudging the man, had suffered to fall into his hands, he extorted from the firm something over a thousand dollars as the price of ending the mischief. He called this process "soaking" the manufacturers. The jury pro-

nounced it extortion and he was convicted of that crime and now appeals from the judgment. Before us, several alleged errors in the trial are asserted as grounds of reversal, some quite technical, but otherwise material to the result and deserving serious consideration.

1. It is objected that the record does not show that any judgment of the conviction was entered in the oyer and terminer. The point is suicidal. If correctly taken we ought to dismiss the prisoner's appeal. His counsel put themselves in the attitude of going to the general term and then coming here on appeal to reverse a judgment which they at the same time assert never had a legal existence. The minutes of the oyer and terminer show the verdict and the rendition of a judgment upon it. We may very well assume the fact of its formal entry from the statement contained in the affidavit of the district attorney on the motion to remit the record to the court below and from the recitals in the notices of appeal served by the prisoner's counsel, which describe a judgment of conviction in the oyer and terminer. The appellant can hardly complain if we do not turn him out of court on his own objection that his appeal is premature.

2. It is asserted that the judgment of the general term was never remitted to the oyer and terminer after affirmance. The record shows that it was. Upon the formal motion of the district attorney, founded upon an affidavit which recited the prior proceedings, the general term ordered that the judgment of conviction appealed from should be affirmed, "and all procedings herein be, and the same hereby are, remitted to the court of oyer and terminer." The order operated to resore the authority of the latter court, which thereafter directed the sentence to be carried out.

3. The third objection is, that the verdict convicts the defendant of the felony charged in the indictment, and that no felony was charged in the indictment because extortion is not a felony. That is a mistake. Whatever may have been the rule at common law, extortion is a felony under the definition of the Penal Code. That definition describes it as a crime "punishable" by death or

imprisonment in the state prison.    By section 702, where the penalty is imprisonment for less than one year, the prisoner goes to the county jail.    By section 703, when the term is one year, he may be confined in the county jail, penitentiary or state prison. By section 704, where the term exceeds one year, he must go to the state prison.    Now, by section 554, the crime of extortion is punishable by imprisonment for a term not exceeding five years. Obviously the offense is "punishable;" that is, may be punished by an imprisonment of one year or more, which may be, or must be, in the state prison.    It is not the actual sentence, but the possible one, which determines the grades of the offense.    People v. Borges, 6 Abb. Pr. 132.

4. The next objection is much more serious, and relates to the ultimate constitution of the jury.    William Rosenbauer, summoned as a juryman, was challenged for actual and implied bias and examined by both parties.    Nothing appeared to justify his rejection, and the challenge was overruled, and the juror sworn and took his seat in the jury-box, being the eleventh juror selected. Four others were then examined and rejected, and the challenge of the fifth was overruled by the court, whereupon the defendant challenged him peremptorily, and in so doing exhausted the last of his five peremptory challenges.    At this stage of the proceedings counsel for the People stated that he desired to interpose a peremptory challenge to one of the jurors who had been sworn and passed into the box, stating as a reason that matters had come to his knowledge since the juror was sworn leading him to believe that the juror is not satisfactory.    Counsel for the defendant objected upon the ground that after a juror had been sworn he cannot be challenged peremptorily except by permission of the court and in the discretion of the court, and that that discretion ought not to be exercised, and cannot be exercised unless some case is made other than the oral statement of counsel: it cannot be exercised upon the bare statement that counsel has learned something without stating what he has learned.    Counsel also objected that the request was not made until after the defendant had exhausted his peremptory challenges.    The court granted the

request of the prosecuting attorney, who thereupon challenged Rosenbauer peremptorily, and the juror left the box. The defendant's counsel excepted to the ruling. The record makes it very plain what the objection and what the ruling were, and so what the exception relied on is. The counsel for the prisoner did not object that the juror could not be challenged peremptorily after having been sworn, but conceded the exact contrary, and admited that he might be so challenged in the discretion of the court, and, admitting and conceding that, aimed his objection at the manner of exercising that discretion, and his sole and distinct point was that the conceded discretion should not be exercised upon the bare statement of the prosecuting attorney and after the defendant had exhausted his peremptory challenges. It was upon that objection that the court ruled, and upon that only, and the ruling was that the discretion of the court being conceded, it was a proper exercise of that discretion to act upon the assurance of the public officer, empowered by the law, to represent the People in the prosecution of criminals. There was no error in the ruling. Assuming the truth of the concession, that the court had discretion to permit a peremptory challenge of a juror after he had been sworn, it was no abuse of that discretion to give the permission upon the assurance of the prosecuting officer. Just that appears to have been done in Tweed's Case, before the Code of Criminal Procedure came into operation, 13 Abb. Pr., N. S., 371, note, and it is not very wonderful that the prisoner's counsel should have thought the rule unchanged and so conceded its existence. They made a mistake. They had a good objection, but did not know it, and with the latter information acquired are seeking so to transform their actual objection as to throw the mistake which they made upon the court, which did not make it. The basis of the effort is that their objection was founded upon and covered by section 371 of the Code of Criminal Procedure. That section reads: "A challenge must be taken when the juror appears, and before he is sworn; but the court may, in its discretion, for good cause, set aside a juror at any time before evidence is given in the action." What constitutes the "good cause" referred to is dic-

tated by succeeding sections. Sections 375, 376, 377. The obvious meaning of section 371 is that a challenge for "good cause," which is required to be taken before the juror is sworn, may, nevertheless, be taken thereafter, and before evidence is given, in the discretion of the court. If it does not mean that it must necessarily mean that the court may, for any good reason, even though undisclosed, set aside the sworn juror in his discretion. I do not think that is its meaning or purpose. If it is, there was no sound objection possible for the prisoner's counsel to take. I prefer the other construction, which they evidently adopt. Now it is quite certain that neither party had any reference to a challenge "for good cause" under section 371. The prosecutor did not ask that. The specific request was to interpose a peremptory challenge. That is defined in section 372 as "an objection to a juror for which no reason need be given, but upon which the court must excluded him." There is no question of good cause about that, and cannot be. It was that request, permission to exclude a juror peremptorily and without assigning any reason, as if he had not yet been sworn, which was made; it was that permission which the prisoner's counsel explicitly conceded lay in the discretion of the court, but which they objected should not be exercised upon the bare statement of the prosecutor that he had learned disqualifying facts without stating what they were. It was not even said that they should be publicly stated, but the contention was that an admitted discretion to permit a peremptory challenge ought not to be exercised upon the bare assurance of the district attorney that he had undisclosed disqualifying facts, and after the prisoner had exhausted his peremptory challenges. Of course, since there was no abuse of the discretion conceded, the exception to its exercise is unavailable on this appeal. The objection itself respected merely the order of the proceeding. The prosecution had not exhausted their peremptory challenges. They might have excluded the juror before he was sworn; they were permitted to exclude him after he was sworn. The order of the challenge was probably material to the rights of the prisoner, but no objection or exception was

taken on that ground. To hold otherwise would be to stray from the uniform rule that an objection must be sufficient to fairly call the attention of the court to the precise point to be decided, must be specific, and must not be ambiguous or misleading. It must not appear to be one thing, when, in truth, it is another. It must not hide, under a deceptive mask, concealed and unknown features. Fairness towards the prisoner does not require unfairness to the trial court, and we cannot here, to reverse a judgment, put upon that court a ruling which it was not asked to make and did not make.

5. The next ground of the appellant's argument is that there was no evidence to sustain the indictment, and the prisoner should have been acquitted by direction of the court. The argument is directed to the point that what the prisoner threatened and did was not an unlawful act, and so no threat of an "unlawful injury to property" was proven, which is a necessary element in the crime charged. More in detail the contention is that Hughes might lawfully refuse to buy goods of Adler & Bros., and might lawfully persuade his friends to do the same thing, and that no more than that is proved against him. That is the innocent form of what in the conversation between Hughes and the manufacturers was determined a "boycott." We must not misunderstand the real question to be determined. It is not the conduct or motives or purposes of the labor organization itself. That is not on trial. The counsel for the prisoner mistakes the issue, when to property" was proven, which is a necessary element in the Knights of Labor, and does not represent them in his present attitude. That organization may be perfectly lawful in its purposes and methods and wield its power and influence usefully and justly, so far as any evidence before us is concerned. It is not here for either praise or blame. The question for the jury was what Hughes threatened, and what was his description of the power that he wielded was, and it does not follow that he described the natural and normal methods of the order instead of a complete perversion of such methods as they would have existed under a more honest and intelligent leadership. What then Hughes

threatened was the first question for the jury.    He described what he was doing, what he could do, and what he intended to do, and it was by force of that description that the money was extorted which was paid.    It is of little consequence that the notices which he scattered over the country were not produced, and no direct proof was given of what he did, and thence to argue that it must be assumed to have been all innocent persuasion.    If it was that and nothing more, then he added falsehood to his other misconduct, for there is nothing doubtful or ambiguous in his description of the punishment which awaited the disobedient. In his letters he tells of notices sent to a multitude of business points, and adds that the firm will feel their effects, and be willing to surrender inside of three months; that "we have spent the money of our organization for results and will get them;" that quite a large expenditure had been made "in carrying on the work;" that Adler & Co. did not know "how effectively this work has been done" or the "amount of work" put in their case; that the work was a "work of destruction" and the struggle "a war of destruction," which the sending of a check and a promise to obey would turn into a "work of construction."    In his conversation with Adler he spoke of what had been done as a "boycott," and described it further by sketching what had been accomplished against the house of Benjamin & Co.; told how he had followed their salesmen along the Pacific coast, procuring the countermand of orders; and boasted that "they never had been beaten in any such controversy, and did not intend to be, no matter what it cost, nor how long it took."    He said, also, that they had $200,000, which they could expend, and would spend, to accomplish any such purpose which they set out to do."    While the negotiation was going on over the amount to be paid, Hughes explained, saying: . "That it was a matter of justice to the retail dealers in these cities themselves that the various organizations of the Knights of Labor in these cities should be notified, because these retail merchants, being placed under the ban as handlers of the product of L. Adler & Bros. they would continue under that ban, and the

stain of handling goods that were boycotted would remain with them, to the prejudice of these retail merchants."

There was more talk of the same general character without modifying its substance, and the attention of the jury was thus drawn to the character and meaning of the language used. Conduct takes its legal color and quality more or less from the circumstances surrounding it and the intent or purpose which controls it, and the same act may be lawful or unlawful as thus colored and qualified. One may refuse to deal with a firm because of a conviction that it does not give honest compensation for labor and may ask his friends or the public to do the same thing, and the conduct may produce injury to the business criticised without thereby becoming illegal. The jury were so told in substance and permitted to judge whether that was the true quality and character of the prisoner's action. On the other hand, one may influence his friends and the public to inflict the same injury of withdrawal of custom without just or excusable reason and by fraudulently concealing the fact that it does not and pretending that it does exist, and using official power and influence to make effective the description and to force and compel unwilling dealers to desist from their purchases and that for the sole purpose of extorting money, in which case the resultant injury will be unlawful. What Hughes threatened was found by the jury to be such an unlawful injury. They saw that he conveyed the idea strongly and clearly that unless his demand of money was complied with he could and would by threatening the hostility of the order compel the retail dealers to withdraw their custom, and could and would utilize the power he had although the original occassion for its exercise was gone. Such a threat, within the doctrine of the Barondess Case, and within that also of the dissenting opinion in this court, amounts to a threat to do an unlawful injury to property. People v. Barondess, 133 N. Y. 649; 45 St. Rep. 248; 61 Hun, 581; 41 St. Rep. 659. There was, therefore, a question for the jury, and the court could not properly have directed an acquittal.

6. There are a multitude of exceptions to the charge of the trial judge and to his refusals to charge, the most of which are suffi-

ciently answered by what has already been said, but one of which
is, perhaps, entitled to a brief consideration.   Complaint is made
of the charge as it respects the question of what constitutes a rea-
sonable doubt.    Substantially, the court charged that it could not
be said to exist where the jury are so firmly convinced of the facts
necessary to establish the prisoner's guilt that if it was a very
grave and serious matter affecting their own affiairs they would
not hesitate to act upon such conviction.    A very similar charge
was approved in People v. Wayman, 128 N. Y. 585; 38 St. Rep.
747, and Miles v. U. S., 103 U. S. 309, to which the respondents
call our attention.    The appellant criticizes the opinion expressed
by the trial judge as to the unfortunate phrasing and character of
the doctrine.    That did not prevent him from giving the prisoner
its full and entire benefit, and there is no rigid rule as to the man-
ner of doing it.    Brotherton v. People, 75 N. Y. 163.   The appel-
lant again takes out from its context the expression, "the truth of
any one of these facts, or the truth of all the facts which it is neces-
sary for the People to establish," and represents the judge as
charging that a firm conviction of any one of the facts would sat-
isfy the rule, even though there were no such conviction as to the
rest.   It is only necessary to read the charge to see that such an
absurd construction does not belong to it, and no member of the
jury could have so understood it.

7.  There are also a great number of exceptions to the rulings
on questions of evidence.    Many of them seem to us unimport-
ant, but some which may be grouped together should, perhaps,
not be silently disregarded, because they are selected out by the
appellant for special notice.    They consist largely of complaints
that the court excluded evidence showing what the original diffi-
culty was, and the details of the quarrel.    All that was material
about it is in the case.    The letters of Hughes and the answers of
Adler show that it was over the number of apprentices to be
employed by the manufacturers.    It is not at all a question of
wages, and there was no claim that anybody was not fully and
fairly paid.   Young men who desired to learn the trade were to
some extent to be shut out for the benefit of those who had learned

it. The court might very well reject all the details of the. difficulty. It was totally immaterial, except by way of explanation, and quite enough was provided for that purpose. The extortion began after the original cause of the trouble had disappeared, as Hughes' letters show, and when it was no longer the motive for a continued assault on Adler's business. Punishment for a past sin and not obedience in the future was the motive, or one of the motives, governing the prisoner's conduct.

The other exceptions relied on have been examined, but are not such as should prolong the discussion.

The judgment should be affirmed .

All concur.

### NOTE ON "BOYCOTT."

Boycotting is a misdemeanor, both at common law and under section 168 of Penal Code. Old Dominion S. S. Co. v. McKenna, 18 Abb. N. S. 281.

It is a criminal offense for two or more persons corruptly and maliciously to confederate together to deprive another of his liberty or property; or to injure other workmen by adopting means to deprive them of their employment. State v. Glidden, 6 N. Y. Cr. 321.

The fact that the conspiracy has a lawful end in view, is no legal excuse for the employment of criminal means. Id.

Where a number of men combine together to injure, and thereby to prevent the exercise of a lawful calling, by congregating near the doors of the person to be injured, by printing circulars descriptive of the supposed grievances, and by distributing the same near and about his doors to the customers and passers-by, and the effect of such overt acts is to intimidate and thereby warn off his customers and the general public who might otherwise patronize him, and to intimidate such person himself, those who conspire and participate in the overt acts, are guilty of the crime of conspiracy under subdivision 5 of section 168 of Penal Code. People v. Kostka, 4 N. Y. Cr. 429. See People v. Wilzig, 4 N. Y. Cr. 403.

Every attempt by force, threat or intimidation to deter or control an employer in the determination of whom he will employ or what wages he will pay, is an act of wrong and oppression. Crump v. Commonwealth, 4 N. Y. Cr. 342. Every combination for such a purpose is an unlawful conspiracy. Id.

Individuals who, by unlawful combinations, seek to interfere with the trade, business or occupation of others, with a view of injuring or embarrassing them in the prosecution of such trade or business are subject to the penalties of the criminal law. Thomas v. Musical M. P. Union, 30 St. Rep. 564; 121 N. Y. 50.

To constitute intimidation, it is not necessary that there should be any overt act of violence, or any direct threat by word of mouth. People v. Wilzig, 4