COURT OF APPEALS,

Feb., 1914.

# THE PEOPLE v. JACOB SEIDENSHNER, FRANK CIROFICI, LOUIS ROSENBERG AND HARRY HOROWITZ.

## (210 N. Y. 341.)

CRIMES—MURDER—APPEAL FROM CONVICTION BRINGS UP FOR REVIEW ONLY THE RECORD IN THE CASE—TESTIMONY CANNOT BE READ INTO IT FROM ANOTHER TRIAL—WHERE RECORD PRESENTS A FAIR QUESTION OF FACT VERDICT SHOULD BE SUSTAINED IN ABSENCE OF ERROR ON TRIAL—EVIDENCE—CONSPIRACY—WHEN TESTIMONY OF CONVERSATIONS IN ABSENCE OF DEFENDANTS ADMISSIBLE—WHEN DESCRIPTION OF DEFENDANTS BY NICKNAMES NOT ERRONEOUS—FAILURE TO LAY PROPER FOUNDATION FOR TESTIMONY FOR PURPOSE OF IMPEACHMENT—WHEN ALLEGED MISUNDERSTANDING ARISING FROM STATEMENTS OF PROSECUTING ATTORNEY CANNOT AFFECT RESULT—REQUESTS AND REFUSALS TO CHARGE.

1. This appeal from a judgment convicting the defendants of homicide brings up for review only the record in this case, in which the rulings of the trial court upon the receipt or exclusion of testimony, and the charges of the court to the jury, and the refusals to charge were made, and upon the testimony in which record the determination of the jury was based. Testimony cannot be read into it from another trial, even if the record in such other trial is on file as a part of the records of this court. Although record evidence not in the return may sometimes be read by the court on review, such rule is only applied in support of a decision, and never to secure a reversal.

2. The important issues in this case are entirely different from the issues in the *Becker* case, decided herewith. In that case Becker's connection with the murder was dependent almost wholly upon the testimony of three conceded accomplices in the murder, and the corroboration of such testimony was dependent very largely upon the

determination of the question whether still another witness was also an accomplice. In this case, while the conspiracy is sought to be shown by the same witnesses and substantially by the same corroboration of such witnesses as in the *Becker* case, and the statements of the opinion in that case are applicable to such testimony, the testimony of prime importance in the determination of this appeal is that relating to the actual fact of the killing of Rosenthal.

3. The jury was required to make a determination upon the testimony before it by determining the credibility of the witnesses produced, and as to which of two sets of witnesse were to be believed. It was the province of the jury and not of the court to determine the truth from conflicting testimony, and within well-defined bounds to determine the relative weight of testimony. The record presented a fair question of fact for the jury to decide and their verdict should be sustained unless some error was committed at the trial that in the interest of justice requires that a new trial be granted.

4. The evidence of a conspiracy between the four defendants and other persons to commit the murder was such as to make admissible testimony of conversations between the other conspirators in the absence of defendants.

5. No error was committed on the trial because the defendants were described by " nicknames." It is necessary in an indictment to name the person charged with crime, and where the person is known by one or more names it is not error, but many times necessary or desirable as a matter of description, to give the several names by which the person indicated is known. There was no such use of any nickname of the defendants or either of them by the district attorney or by the court as will support a claim that the defendants or either of them were prejudiced thereby.

6. The court refused to allow testimony to be given for purpose of impeachment of a conversation had with a witness for the prosecution, in which it was claimed he had made statements inconsistent with his evidence. *Held*, that there was no proper foundation laid for such testimony, and hence no error was committed.

7. The assistant district attorney did not violate the bounds of propriety or legal right either in the opening address or in his presentation of the case to the jury. The testimony was complicated, and it was the duty of counsel for the prosecution, as well as for the defendants, to discuss the same from their respective standpoints, and in doing so unless statements were made that could not have been corrected if attention had been called thereto on the submission of the case to the jury by the court, any alleged misunder-

standing arising from such statements so acquiesced in ought not to affect the result.

8. Defendant's counsel requested the court to charge that "the jury in this case are not concerned with the result of the trial of any other person mentioned in this indictment. These defendants may be innocent of the crime charged against them and yet others mentioned in this indictment be guilty; and the fact that the jury may know the result of the trial of Charles Becker, co-defendant herein, must in no way affect them in the determination of the questions in this case, as the innocence or guilt of these defendants is to be determined only by the evidence here presented." In response to this request the court said: "I refuse to charge that request in the language presented, but will charge it in part, that the innocence or guilt of the defendants must be determined solely upon the evidence before the jury irrespective of any knowledge the jurors may have of the result of the trial of Charles Becker." The court was requested to charge that "the case is not to be determined upon the opening addresses of the district attorney or counsel for the defendants. It is the evidence in the case which is to receive the attention of the jury." The court: "I charge that, but I add to that, that the arguments of counsel when based upon the evidence are also to receive adequate attention from the jury." A further request was that "the jury will disregard all references to the character or fate of one Jack Zelig; he is not a party to this indictment and is not concerned with the issues in this case, excepting so far as he is involved in the interviews that were had by Jack Rose with these defendants and the relation of the defendants with said Jack Zelig." The court, in response: "I decline to charge in the language presented, as it is incomplete or misleading, but I will charge part of the request, namely, that the jury must not take into consideration the fate of Jack Zelig." *Held*, no error.

9. The counsel for defendants, referring to statements made by the court in the main charge, said: "I ask your honor to charge the jury so far as the skeleton of the evidence of the prosecution and defense is concerned if the recollection of the jury as to the evidence differs from that which your honor has embodied in the skeleton then the recollection of the jury must control and not your honor's recollection." To this request the court properly replied: "I so charge and I say in general that if at any time during my charge I have inadvertently fallen into any error or mistake touching the evidence or the testimony of any witness, it is your recollection, gentlemen, that must control and not mine."

10. There is no error of law that requires a reversal of the judg-

ment against the defendants, or either of them, nor any unfairness toward the defendants which makes a new trial necessary in the interest of justice.

(Argued December 17, 1913; decided February 24, 1914.)

APPEAL by each of the above-named appellants, from a judgment of the Supreme Court, rendered November 26, 1912, at an extraordinary Trial Term for the county of New York upon a verdict convicting the defendants of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*A. T. Clearwater, Charles G. F. Wahle* and *H. Lionel Kringel* for appellants. The court will take judicial notice of its own records, and it is proper to refer to the record in the case on appeal in People v. Becker, on file. (Vose v. Yulee, 64 N. Y. 452; Story v. Ulman, 88 Md. 244; People v. Board of Excise, 17 Misc. Rep. 101; Matter of Transfer Cases, 46 Misc. Rep. 581.) The verdict is against the weight of, and finds no support in, credible evidence. (People v. Raffo, 180 N. Y. 434; People v. Ferrara, 199 N. Y. 414; People v. Poulin, 207 N. Y. 73; People v. Corey, 157 N. Y. 351; People v. Pettanza, 207 N. Y. 560; People v. Razezicz, 206 N. Y. 249; People v. Farmer, 196 N. Y. 65; People v. Gallo, 149 N. Y. 112; People v. O'Farrell, 175 N. Y. 323; People v. Page, 162 N. Y. 272.) Admission of Rose's testimony of conversations and transactions with Becker; of Rose's transactions with Webber; of Webber's conversations and transactions with Becker, and of Vallon's transactions with Becker, all in the absence of defendants, was error. (People v. McKane, 143 N. Y. 455; People v. Storrs, 207 N. Y. 147; 1 Greenl. on Ev. [5th ed.] 233 People v. Quinn, 123 App. Div. 682.) It was error prejudicial to defendants, appellants, to attempt to introduce evidence of a pistol expert, and refuse to strike

out cross-examination of defendant Rosenberg as to pistols. (Cosselman v. Dunfee, 172 N. Y. 507; People v. Davey, 179 N. Y. 345; People v. Conrow, 200 N. Y. 356; Ives v. Ellis, 169 N. Y. 85; People v. Smith, 172 N. Y. 239; People v. Pettanza, 207 N. Y. 560; People v. Montgomery, 176 N. Y. 219; People v. Cascone, 185 N. Y. 317.) Curtailing examination of the witness Marshall was error prejudicial to the defendants. (Hertz v. Mizesheimer, 12 Misc. Rep. 58; Sloane v. N. Y. C. R. R. Co., 45 N. Y. 126; People v. Thornton, 46 Hun, 643.) The conduct of and proceedings at the trial were grossly prejudicial to defendants, appellants. (People v. Davey, 179 N. Y. 345; People v. Pettanza, 207 N. Y. 560; People v. Corey, 157 N. Y. 332; People v. Lustig, 206 N. Y. 163; Matter of Hesdra, 119 N. Y. 615; People v. Rosenthal, 197 N. Y. 394; People v. Fisher, 14 Wend. 9; People v. Dumar, 106 N. Y. 592; People v. Corbalis, 178 N. Y. 516; N. Y. & L. C. T. Co. v. Hurd, 8 N. Y. S. R. 718.) Statements erroneous in fact, doubtless inadvertently, made by the learned presiding justice to the jury, of his own recollection of the evidence, together with comments upon the facts and the evidence bearing upon them, not supported by the record, resulted in greatly prejudicing the rights of these defendants, and constituted reversible error. (People v. Corey, 157 N. Y. 332; Brooks v. Rochester Ry. Co., 156 N. Y. 244; People v. Barberi, 149 N. Y. 256.) Refusal of the court to charge defendants' requests constituted reversible error. (1 Wigmore on Evidence, 197, § 136; State v. Powers, 72 Vt. 168; Jordan v. State, 39 So. Rep. [Fla.] 155; McNamara v. People, 24 Colo. 61; Foler v. State, 16 Ohio St. 583; Ayers v. State, 21 Tex. App. 399; People v. Stone, 117 N. Y. 480; People v. Shanley, 49 App. Div. 56, 59; State v. McClellan, 23 Mont. 532; Comm. v. Choate, 105 Mass. 451; Payton v. State, 54 Neb. 188; Burns v. State, 75 Ohio St. 14, 26.)

*Charles S. Whitman, District Attorney (Robert C. Taylor of counsel), for respondent.* The general charges of " prejudice " in the appellant's brief cannot be sustained. (People v. Cummings, 206 N. Y. 283.) A case of murder in the first degree was abundantly proved. The record is full of contradictions; but they were for the jurors to resolve. It would seem that there was at least competent evidence to sustain the verdict; and this court will accept such a verdict as conclusive. (People v. Peckens, 153 N. Y. 576; Ruloff v. People, 45 N. Y. 213; Kelley v. People, 55 N. Y. 565.; People v. McKane, 143 N. Y. 455; People v. Van Tassell, 156 N. Y. 561; People v. Driscoll, 107 N. Y. 414; People v. Mooney, 178 N. Y. 91; People v. Katz, 154 N. Y. 44; 209 N. Y. 311; People v. Taylor, 138 N. Y. 398; People v. Egnor, 175 N. Y. 419; People v. Rodawald, 177 N. Y. 408; People v. Decker, 157 N. Y. 186.) The corroboration was sufficient. (People v. O'Farrell, 175 N. Y. 323; People v. Strauss, 94 App. Div. 453; 179 N. Y. 553; People v. Hooghkerk, 96 N. Y. 149; People v. Elliott, 155 App. Div. 486.) Error cannot be predicated upon the alleged curtailment of the cross-examination of Marshall. (Wigmore on Ev. §§ 906, 1018, 1043, 1132, 2113, n. 6; Bearss v. Copley, 10 N. Y. 93; Sloan v. N. Y. C. R. R. Co., 45 N. Y. 127; Plyer v. Germ.-Am. Ins. Co., 121 N. Y. 689.) No errors were committed in the cross-examination of the defendants. (People v. Irving, 95 N. Y. 541; Nolan v. B., etc., R. R. Co., 87 N. Y. 63; People v. Dorthy, 156 N. Y. 237; People v. Brown, 72 N. Y. 571; People v. Crapo, 76 N. Y. 288; People v. Ryan, 79 N. Y. 594; People v. Morrison, 194 N. Y. 175; People v. Cardillo, 207 N. Y. 70; People v. Casey, 72 N. Y. 393.) Omnibus claims that the trial was grossly prejudicial are not sustained. (People v. Rimieri, 180 N. Y. 163; People v. Smith, 180 N. Y. 125; People v. Gillette, 191 N. Y. 107; People v. Poulin, 207 N. Y. 73.) Criticisms of Mr. Moss' summing up to the jury present

no error.   (People v. Conklin, 175 N. Y. 333; People v. Smith,
180 N. Y. 125; People v. Gillette, 191 N. Y. 107; People v.
Poulin, 207 N. Y. 73.)    There were no errors in the charge.
(People v. Koenig, 180 N. Y. 155; People v. Johnson, 185 N.
Y. 219; People v. Gilbert, 188 N. Y. 10; People v. McCallam,
103 N. Y. 587; People v. Reich, 110 N. Y. 660; People v.
Tobin, 176 N. Y. 278; People v. Wolter, 203 N. Y. 484.)
Allegations of error in refusing requests to charge are not sus-
tained.   (People v. Pallister, 138 N. Y. 601; People v. Tobin,
176 N. Y. 278; People v. Boggiano, 179 N. Y. 267; People v.
Katz, 154 App. Div. 44.)

CHASE, J.   Herman Rosenthal was shot and killed a few
minutes before two o'clock on the morning of July 16, 1912,
immediately after he had walked out from the restaurant of the
Hotel Metropole upon the sidewalk on the north side of Forty-
third street between Broadway and Sixth avenue in the city of
New York.

On August 20, 1912, Charles Becker, the four defendants,
Seidenshner, Cirofici, Rosenberg and Horowitz, and Jack
Sullivan and William Shapiro were jointly indicted charged
with murder in the first degree in that they had deliberately
and with premediation effected the death of Rosenthal.

Rosenthal was a professional gambler and for some time prior
to the homicide had been the proprietor of a gambling house
on Forty-fifth street in said city.   Three other men mentioned
in the record, Jacob Rose, Louis Webber and Harry Velinsky
(Vallon), were also professional gamblers.   One Samuel
Schepps, also mentioned in the record, was an intimate friend
of Rose, and acted for him as a messenger and carried out such
directions as were given to him by Rose.   The four last-men-
tioned men had been friends for four years.   Charles Becker
was a lieutenant in the police force in the city of New York,

and at the time of the homicide and for some months prior thereto had been the head of what is known as a " Strong arm squad." The duty of such squad was to see that the law was enforced. It was their particular duty to suppress gambling houses and other direct forms of vice carried on or maintained by deliberate violators of the law.

It is the theory of the prosecution that Becker was a partner of Rosenthal in the maintenance of the gambling house on Forty-fifth street and that Rose was his representative in such partnership. Becker was well acquainted with Rose, Webber and Rosenthal. Rosenthal's gambling house on Forty-fifth street was raided by Becker and other members of his squad in April, 1912. Thereafter Rosenthal became angry at Becker and severely criticised him because of the raid and because of his alleged failure to protect him (Rosenthal) in the maintenance of the gambling house. He threatened to expose Becker's alleged relations with him in the gambling business. It is further claimed by the prosecution that Becker's fear of Rosenthal led him to desire that Rosenthal be murdered, and that he communicated his desire to Rose. It is further claimed that to protect Becker and also the so-called gambling fraternity Becker conspired with Rose, Webber and Vallon to employ men to murder Rosenthal, and that in pursuance of such conspiracy the defendants were employed to commit the murder.

Becker demanded a separate trial upon the indictment and he was the first to be tried thereon. He was found guilty and judgment of death was entered against him. An appeal was taken from such judgment to this court, and the decision upon such appeal is handed down with the decision herein.

It is conceded that Rose, Webber and Vallon, and, it is claimed, Schepps, are morally and legally guilty of the murder of Rosenthal. Prior to the indictment the district attorney, with the approval of the court, entered into separate written

agreements with Rose, Webber, Vallon and Schepps, by which each consented to appear before the grand jury and fully and truthfully give his testimony concerning the murder of Rosenthal and the criminal liability of Charles Becker; and the district attorney upon his part agreed with each that he would not be prosecuted for said crime if it appeared that he did not fire any of the shots at the body of Rosenthal and that he should remain in prison until after Becker's trial.

The principal part of the testimony in this case relates to the actual occurrences at or immediately preceding the homicide, and we will refer particularly to such testimony after first briefly stating the testimony by which the defendants seek to explain the admitted presence of three of them at the time of the homicide and by which the prosecution seeks to show the purpose of the defendants in actually committing the homicide.

One Zelig, a friend of the defendants and a man of great influence among those with whom he associated, was arrested on the 13th or 14th of May, 1912, charged, as a second offense, with carrying concealed weapons. He insisted that he was wholly innocent of the charge and that certain members of the police force had surreptitiously placed a pistol in his pocket and then arrested him on the charge as stated. He was held in default of $4,000 bail. Rose was informed that Zelig and his friends accused him of having instigated his (Zelig's) arrest. The next day a conference was held between Rose, Webber, Vallon, Schepps and one Sam Paul, and the defendants Seidenshner and Rosenberg, at which conference Rose asserted his innocence of the charge made against him, and Webber advanced the money to pay a surety company to sign Zelig's bail bond, asserting that he did so " just to show how we all feel about it and to assure you that Jack had nothing to do with it." (The arrest of Zelig.) Zelig was released on bail. About June 2, Zelig, Rosenberg and Seidenshner were arrested in con-

nection with a miscellaneous shooting affray in a part of the city known as Chinatown, in which Rosenberg and Zelig were slightly wounded. They were arraigned in the Criminal Courts Building and afterwards as Zelig left the building he was shot and wounded in the back of the head. Zelig was taken to a hospital and about the same time his bail on the previous charge was increased to $10,000. While Zelig was in the hospital, Rose met the defendants Seidenshner and Rosenberg at the residence of one of them at 747 Southern boulevard and at which apartments Horowitz and Cirofici were frequent visitors and Seidenshner and Rosenberg were warned by Rose not to go downtown as they would be arrested for carrying concealed weapons, whether they had the weapons on their persons or not, and Rose testified that at that interview he said " that Becker said that if they would agree to get rid of Rosenthal and silence him so he wont cause any further annoyance or trouble for Becker, that then and only then would they be safe to appear on the streets of downtown. * * * They said 'Well all right we will do anything that you or Becker wants us to do' and I said 'Well there is only one thing Becker wants and that is he wants Rosenthal put out of the way.' They said 'All right when is this to happen' I said 'Well now you wait, all I want is to be able to report back to Becker that you have agreed to do this; now, I said, 'you await my orders, I will come here some night and get you and bring you down to where Rosenthal is and then you will do this, but in the meantime' I said, 'if anybody comes making any inquiries you tell them I have seen you about the matter.'"

Rose further testified that the same week he saw Seidenshner and Rosenberg at the apartments on Southern boulevard and he further testified: "They asked me if I had been to the Tombs to see Zelig. I told them 'yes.' They asked me did I discuss the Rosenthal matter with Zelig. I told them 'yes.' I

also told them that Zelig was agreeable to them doing anything that I asked of them but he made the one condition that first he wanted to be liberated on bail. They told me that as soon as Zelig was bailed out that they would carry out his orders." He further testified that he told them that Becker was asking every day as to what was being done in the Rosenthal matter and that he, Becker, was growing very impatient and was threatening all sorts of things, and they replied, "That he should bear with them a few days longer until Zelig was out on bail and then Rosenthal would surely be croaked." Subsequently and about July 2, bail of $10,000 was obtained by Rose and his friends and Zelig was liberated. Rose also met Horowitz and Cirofici with Seidenshner and Rosenberg at the apartments on the Southern boulevard. Cirofici had been living at the apartments of one Jean Gordon at 2529 Seventh avenue since the first week in May. Subsequently and commencing about the 26th of June the four defendants occupied the Seventh avenue apartments until after the homicide, except that Seidenshner, Horowitz and Rosenberg were away for a few days at Rockaway. Rose testified that he saw all of the defendants except Seidenshner after they had moved to Seventh avenue, and had a conference with them there, and " that he told them that Rosenthal was growing more determined in his threats to expose Becker and that Becker was all the time asking when those fellows were going to do that job. I had assured Becker, I told them, that they were on the job, and Becker wanted to know the cause of this long delay, particularly now that Zelig was out on bail." It is claimed by the prosecution that the murder of Rosenthal was afterwards planned for July 12, at the Garden restaurant, but that although the four defendants were present the murder was not then carried out because of a statement made to them by Rose that he was about positive that they were being watched. The details of the

Garden restaurant transaction are unimportant for this opinion.

On the night of July 15, Rose, Vallon and Schepps were at Sharkey's saloon on Fourteenth street. They had an automobile but a tire had burst and they procured another, a gray car, of which Shapiro was the chauffeur, and the three men went in the car with Shapiro to 2529 Seventh avenue where they found Cirofici, and they returned with him to Webber's poker rooms at Forty-second street and Sixth avenue. The defendants Seidenshner, Rosenberg and Horowitz were waiting outside of Webber's rooms and they, with the occupants of the car, but not including Shapiro, went into the rooms and had refreshments. The presence of the four defendants at Webber's a short time before the homicide is admitted. It is asserted and not denied that Seidenshner, Rosenberg and Horowitz had been at a rendezvous on Second avenue which Horowitz admitted was a hang-out place for thieves, gamblers and others, and that they had come from Second avenue to Webber's rooms pursuant to a telephone communication received from Webber. We now come to the more direct testimony immediately preceding and at the time of the homicide.

Webber testified that he went out of his rooms and saw Rosenthal at the Hotel Metropole and then returned and reported to the defendants and that they then left the rooms. Rose, Webber, Vallon and Schepps testified that they remained at Webber's rooms. Shapiro, the chauffeur, testified that he went to Sharkey's saloon pursuant to a telephone message received by him at his stand at Second avenue and Tenth street. He further testified to the trip to 2529 Seventh avenue and back to Forty-second street and Sixth avenue; that the four passengers including Cirofici got out of his car and went into Webber's while he remained with his car on the opposite side of the street; that he remained there fifteen or twenty minutes

and that the defendants (whom he positively identified) came out of Webber's and got into his car; that Rose told him to drive around to Forty-third street and Broadway near the Metropole; that he drove up Sixth avenue to Forty-third street and west on Forty-third street until Cirofici ordered him to turn around; that he stopped his car by Cohen's theatre and the four defendants got out and walked towards the Metropole; that he stood there about fifteen minutes when he heard a shot, then about three or four shots, and the same four men that he carried from Webber's place, being the four defendants on trial, ran to his car; that two had revolvers in their hands; that he thinks they were Frank and Louis; that two got in one side of the car and two on the other side. He further testified that Gyp the Blood put a gun to his head and said: "Hurry up, you boob, drive away." He testified that he drove up Forty-third street to Madison avenue, to Forty-fifth street, to Grand Central bridge, to Lee avenue, to One Hundred and Twenty-sixth street, and at that point they got out of the car and told him to drive downtown.

One File, a policeman who was off duty at the time of the homicide, testified that he was in the Metropole restaurant and was attracted by four pistol shots. He ran to the street and saw two men getting into an auto about 200 feet away, diagonally across the street, but did not recognize them; that he obtained another auto and gave pursuit, but failed to apprehend them.

One Brady, a policeman on duty in the center of Times square, heard five pistol shots and ran to the place of the homicide and found Rosenthal there, dead, lying on his back.

One Hecht, a waiter at the Metropole, testified that he saw Rosenthal leaving the restaurant; that he heard a shot and "ducked;" that he looked out again and saw Rosenthal fall; that he heard altogether three or four shots; that he saw at

least one man fire after he (witness) "ducked." He further testified that there were two men on each side and one behind; he did not see their faces.

One Krause, whose business is that of a waiter, was on the street and he testified that he saw a bunch of men standing around and he wanted to know what was going on. He further testified: "I saw four men shooting—shooting at the man who came out of the Metropole. The second man who came out of the Metropole. I saw two men come out; one man came out and gave a signal; put his finger there. [Indicating.] I saw four pistols; a pistol in the hands of each of these men. I saw these pistols pointed at Rosenthal." The witness positively identified the defendants Seidenshner, Rosenberg and Cirofici as three of the men who did the shooting. He says the fourth man had his back to him and he could not identify him. After the shots were fired they all ran back to the car and he saw the same four men get into it.

One Luban was in the Metropole when Rosenthal went out. He says Rosenthal went out of the door and returned and then went out of the door a second time; that he then heard four or five shots. He positively identifies the defendants Cirofici, Rosenberg and Horowitz as three of the persons who did the shooting, but is not sure about Seidenshner. He says that they had pistols in their hands and after the shooting they ran across the street and got into the car.

One Stanich testified that he was near the Cadillac Hotel, forty feet away from the place of the homicide; that he heard the first shot and turned around and saw the different persons; he thinks there were four who shot with revolvers; that he saw Rosenthal fall to the ground. He identified the defendant Seidenshner as one of the men who did the shooting and further testified that he saw a pistol in his hand, and in the hands of three or four men, but that he cannot identify the others; that

he is sure that two of them had pistols, but the shots were more than two; that he thinks he heard five shots; that he saw five people in front of the Metropole, but did not see either Rose, Webber, Vallon or Schepps.

Schepps testified that about 7:30 in the morning of the homicide he went to the Seventh avenue house and saw the defendants and they asked him where they were going to get the money; that he went back and saw Rose and then went the second time to the Seventh avenue house and saw Cirofici and Rosenberg and made an appointment with them to meet Rose at 2:30 in the afternoon at Fiftieth street and Eighth avenue; that pursuant to such appointment he went with Rose and met Cirofici and Rosenberg at Fiftieth street and Eighth avenue, and Rose gave Rosenberg a package which he understood contained $1,000, and that Rose said to him: "Lay low for a few days and above all not to talk." Seidenshner, Rosenberg and Horowitz then left the city and Cirofici left the Seventh avenue house, although his rent was paid for some days thereafter, and he went to live at another place in the city. It was some time after the indictment before they were all taken into custody.

The defendants each took the stand and denied all connection with the shooting and with any agreement to murder Rosenthal. They all admit that they were at Webber's rooms a short time before the homicide. Each of the defendants testified to a strange man being at Webber's. They each testified that Rose said to them at Webber's that they would meet certain policemen by whom he would prove that he (Rose) was innocent of a frame-up against Zelig. Horowitz testified that the strange man went out of Webber's and came back again after which the defendants left Webber's, and Cirofici went home. There is no explanation of Rose and others procuring an automobile and going to 2529 Seventh avenue after

Cirofici if he was, without question, to return at once as is claimed by him. Horowitz further testified that the strange man went with him and with Seidenshner and Rosenberg toward Broadway and stopped near the Hotel Cadillac; that the strange man went across the street to Rose, Vallon, Schepps and Webber; that they continued toward the Metropole, the strange man first, Webber and Vallon next, and Schepps and Rose behind; that he heard a shot and looked and saw Vallon and Webber firing; that the strange man fired first and that he with Seidenshner and Rosenberg ran to the subway and took a train to 2529 Seventh avenue, where they found Cirofici; that he believed at the time that he and his friends were being shot at.

Seidenshner testified that the strange man with Webber, Rose, Vallon and Schepps went out of Webber's rooms, and that in about fifteen minutes the stranger came back and said Rose wanted them to come around to the Metropole and that they all went, but when they got out on the sidewalk he noticed that the gray car in which Cirofici came was not standing there; that Cirofici went home and that he and the others went around by the Cadillac Hotel; that the stranger went across the street to Rose, Webber, Vallon and Schepps, and after talking two or three minutes they went on to the Metropole in the order stated by Horowitz; that the stranger fired and Vallon and Webber were shooting; that he thought they were shooting at him and his friends and that they ran to the subway.

Rosenberg's testimony is to the same effect, and Cirofici's testimony of what occurred up to the time that he claims that he left the others, is in corroboration of the testimony of Seidenshner, Rosenberg and Horowitz. Considerable testimony was offered for the purpose of affecting the credibility of the witnesses for the prosecution and for the defendants

respectively, but such testimony simply bears generally upon the weight of the evidence as it was presented to the jury, and we cannot extend this opinion to repeat it herein. The important issues in this case are entirely different from the issues in the *Becker* case, decided herewith. In that case Becker's connection with the murder was dependent almost wholly upon the testimony of Rose, Webber and Vallon, conceded accomplices in the murder, and the corroboration of such testimony was dependent very largely upon the determination of the question whether Schepps was also an accomplice. In this case, while the conspiracy is sought to be shown by the same witnesses and substantially by the same corroboration of such witnesses as in the *Becker* case, and the statements of the opinion in that case are applicable to such testimony, the testimony of prime importance in the determination of this appeal is that relating to the actual fact of the killing of Rosenthal. The simple question is whether the murder was committed by the defendants or by others. If the direct testimony given by the witnesses called on behalf of the People in this case is true, the defendants are guilty of the actual murder of Rosenthal, and the other testimony in the case is of minor importance.

Counsel for the defendants in their brief have quoted very frequently and at considerable length from testimony given in the *Becker* case, not in this record, for the purpose of comparing the testimony given by witnesses on such trial with the testimony given by the same witnesses on this trial, and seek by showing differences or inconsistencies therein to affect the weight to be given in this case to the testimony of such witnesses. This appeal brings up for review the record in this case, in which the rulings of the trial court upon the receipt or exclusion of testimony, and the charges of the court to the jury, and the refusals to charge were made, and upon the testimony in which record the determination of the jury was based.

It is conceded that the attorney for the defendants had a copy of the record in the *Becker* case in his possession before the commencement of the trial of this case. If the testimony given by any witness on this trial was inconsistent with the testimony of such witness on the Becker trial, that fact should have been called to the attention of the witness when he was on the stand and an opportunity given to him to explain the inconsistency. The record cannot now be changed, nor can testimony be read into it from another trial, even if the record in such other trial is on file as a part of the records of this court. (See People v. Hoch, 150 N. Y. 291, 305; *S. C.*, 150 N. Y. 566; People v. Rimieri, 180 N. Y. 163, 170; People v. Hughes, 137 N. Y. 29, 37, 9 N. Y. Crim. 277.) The record of testimony in the *Becker* case is not record evidence within the rule that record evidence not in the return may sometimes be read by the court on review, and, moreover, such rule is only applied in support of a decision, and never to secure a reversal. (Stemmler v. Mayor, etc., of New York, 179 N. Y. 473, 482.)

The witnesses called by the prosecution have been severely criticised for their depravity. It is quite true that most of the witnesses called by the prosecution and by the defense are of the criminal and depraved class. In the very nature of things horrible events such as the one narrated in this record are not witnessed, except it be by mere chance, by people of savory history and clean, moral lives. This record shows that an awful crime was committed in defiance of law and honor for some specific purpose and pursuant to a deliberate plan. The crime was neither an accident nor the result of heated passion. To determine who were the persons guilty of the crime there was no choice of witnesses. It was necessary to take the testimony of such persons as saw the occurrence and of those who had knowledge of facts leading up to the homicide. Notwithstanding the testimony was somewhat unsatisfactory, and in

some particulars contradictory, the conclusion had to be reached by determining the credibility of the witnesses produced, and as to which of two sets of witnesses were to be believed. The jury was required to make a determination upon the testimony before it. It is the province of the jury and not of the court to determine the truth from conflicting testimony, and within well-defined bounds to determine the relative weight of testimony.

This court in People v. Taylor (138 N. Y. 398, 406, 10 N. Y. Crim. 420) say: "Under our system of criminal jurisprudence, it becomes the exclusive province of the jury to determine whether the evidence pointing to the guilt of the accused is so lacking in convincing force as to leave an intelligent and discriminating mind in doubt as to the truth of the charge contained in the indictment. When the jury, by their verdict, have declared that no such condition of mental uncertainty has arisen from a contemplation of the evidence, the prisoner has had the full benefit of the rule of law which protects him from punishment, unless his crime is established beyond a reasonable doubt, and the question is not open for review in this court, unless the case is so weak that the verdict should be set aside because against the weight of evidence, or for other sufficient cause." (See People v. Katz, 154 App. Div. 44–47, 29 N. Y. Crim. 444; affd., 209 N. Y. 311; People v. Egnor, 175 N. Y. 419–425, 17 N. Y. Crim. 388; People v. Rodawald, 177 N. Y. 408–419, 18 N. Y. Crim. 142; People v. Decker, 157 N. Y. 186–195, 13 N. Y. Crim. 364.)

In People v. Ferraro (161 N. Y. 365, 377; 14 N. Y. Crim. 266) this court, referring to a determination of a question of fact, say: "It would be hazardous for seven judges of the law * * * to say that the twelve judges of the fact were wrong * * *. It is impossible for us to say, and the nearest ap-

proach to justice that can be made is to leave such questions to the jury."

In People v. Sanducci (195 N. Y. 361, 367; 23 N. Y. Crim. 389) this court say: " The credibility of witnesses is necessarily for the twelve jurors who looked into their faces and heard them testify rather than for the seven judges who simply read the printed record of what they said."

We are of the opinion that the record in this case presented a fair question of fact for the jury to decide and that the jury's determination shows that they believed the People's witnesses and disbelieved the defendants and their witnesses. Their verdict should, in our judgment, be sustained unless some error was committed at the trial that in the interest of justice requires that a new trial be granted.

Counsel for the defendants allege that error was committed in allowing testimony of conversations between Rose, Webber and Vallon, or some two of them, or conversations between one of them and Becker, without the presence of defendants. The evidence of a conspiracy between Rose, Webber and Vallon and the four defendants to murder Rosenthal was such as to admit the testimony of either relating thereto. There is some testimony in the record to show that Becker conspired with the others named to bring about the death of Rosenthal, and testimony of conversations between Becker and any one of the other conspirators was properly received in evidence. In any event the admission of conversations between Becker and either Rose, Webber or Vallon in the absence of the defendants, was not error, because all of the material testimony relating to such conversations was substantially repeated to the defendants or some one of them, and they as conspirators with Becker, Rose and others, or with Rose and others, acted upon the reported conversations with Becker assuming that they were had, and that the conversations with him were truthfully reported.

The question as to whether Schepps was or was not a co-conspirator is not of the same importance in this case as it was in the Becker case, and the determination of the question as to whether he was a co-conspirator as a matter of law, or whether he was a co-conspirator as a matter of fact, is not of sufficient importance for further discussion.

Counsel for the defendants assert that error was committed on the trial because the defendants were described by "nicknames, opprobrious and insulting in their character, carrying in their very terms implications against the morality, the method of life and nationality of the various defendants." It is necessary in an indictment to name the person charged with crime, and where the person is known by one or more names it is not error but many times necessary or desirable as a matter of description to give the several names by which the person indicted is known. The defendants were named in the indictment as Frank Muller, alias Whitey Louis, alias Whitey Jack, alias Louis Seidenschue, alias Jack Biegel—Frank Cirofici, alias Dago Frank, alias Frank Palmer—Louis Rosenberg, alias Lefty Louie, alias Louis Marks, alias Louis Baker, alias Charles Raymond—Harry Horowitz, alias Gyp the Blood. It was subsequently ascertained that the true name of Frank Muller was Jacob Seidenshner. The testimony of the defendants shows that the district attorney was justified in the use of more than one name in describing them.

Seidenshner, as a witness, testified that he had used the name of Frank Muller, Siden, Miller and Goldberg; that he had not used the name of Whitey Jack, but had been called Whitey Jack, Jack White, and had been known as Whitey, but not as Whitey Lewis. He also testified that after the homicide he saw his picture and the name Whitey Lewis in the newspapers and knew that it referred to him. He further testified that he did not use his family name "because I would not disgrace my name

—because I was a thief and everything." Frank Cirofici testified to using the names Harris, Gordon, etc. Louis Rosenberg testified that he had used the names Charles Raymond, Lewis Baker and Lewis Marks, and that he had not used his own name because he did not want to disgrace his family.

The four defendants are professional lawbreakers and were commonly known among themselves and their friends as Whitey, Frank, Lefty and Gyp, and they seldom referred to one another in their testimony in this case except by such nicknames. The designation of the defendants in the indictment and other papers does not appear to have been in bad faith; indeed the use of such names was common or least frequent on the part of every one connected with the trial, and it was in fact the most certain way of identification. The only possible inaccuracy in the use of nicknames on the trial, as appears by the defendant's own testimony, was in adding words to the admitted nicknames of Whitey, Frank, Lefty and Gyp, and such added words were not without evidence to justify their use.

In People v. Everhardt (104 N. Y. 591, 596) the defendant was described in the indictment as " George Hartman, otherwise called George Peters, otherwise called Mash Market Jake, otherwise called Charles Coke, otherwise called Charles McGloin. Upon the trial, these names were repeated by the clerk in the oath administered to the jurors challenged, and the counsel for the defendant objected to the repetition of such names on the ground that it tended to prejudice the defendant in the minds of the jurors; and he admitted and offered to prove that the true name of the defendant was Charles Everhardt. The trial judge stated in reply that he could see no objection to the clerk inserting in the subsequent proceedings the name which the defendant asserted was his true name, and referring to the fact that he was indicted under another name." An ex-

ception was taken. Counsel " asked the court to instruct the clerk, in swearing the jurors and the witnesses that he should designate the defendant as Charles J. Everhardt, and omit the fictitious names. The court replied that he would instruct the clerk to designate the defendant as Charles J. Everhardt, and would allow him to state the several other names," and it was thereafter done during the trial. An exception was taken to the ruling of the court. This court, in referring to the ruling in the trial court, say: " No material error was committed by the repetition of the fictitious names. While undoubtedly they might with propriety have been omitted in the administration of the oath to the jurors and witnesses after the true name was discovered and inserted in the indictment and other proceedings, yet as such names all appeared in the indictment and in the evidence it was not error to repeat them whenever it became necessary to name the defendant, and it cannot be assumed that any legal harm was thereby done to him." In this case every name in any way applied to the defendants was to some extent used in the testimony entirely independent of any suggestion by the district attorney. There was no such excessive use of any nickname of the defendants or either of them by the district attorney or by the court as will support a claim that the defendants or either of them were prejudiced thereby.

Counsel for the defendants urge that their clients were prejudiced because they were referred to by the district attorney as " gunmen." When the word was first used in the opening the attorney for the defendants objected to its use, and the counsel, speaking in behalf of the district attorney, said: " I will refrain from it." He did refrain from any prejudicial use of it, and the court was not at any time requested to make a ruling upon or statement to the jury in regard to the use that was made of such word.

Rosenberg testified on cross-examination, without objection,

that five or six months before he received two revolvers from a drunken man, who said he had purchased them for seventy-five cents; that he told the man that he would get pinched if he went out with them, and that he took them from the man and put them in the bottom of his trunk. This occurred at 2529 Seventh avenue, and Rosenberg testified that he sent the trunk away after the homicide, and that the revolvers were not fired after he received them. The revolvers were offered in evidence, but were not admitted, although the court marked them for identification as Exhibits 9 and 10. Subsequently the prosecution called a witness who had made a study of revolvers and their appearance, for the purpose of determining the time that had elapsed since they had been fired. He was then shown Exhibit 9 and asked if he had an opinion as to the time that had elapsed since it had been fired and he answered "yes." He was then asked for his opinion. The question was objected to and the court said: "I sustain the objection. So far as the testimony appears there is nothing to show but that the pistol may have been fired from the time it was found in the trunk of one of these defendants up to the time that the witness examined it." The witness was withdrawn. Subsequently a motion was made by the defendants' counsel to strike out the testimony given by Rosenberg relating to the two revolvers, which was denied. Counsel for the defendants then moved that the testimony of the revolver expert be stricken from the record and the jury be asked to disregard it. The court granted the motion and so instructed the jury. Counsel for the defendants now insist that the attempt on the part of the district attorney to obtain an answer to his question to the revolver expert when, they allege, that the district attorney should have known that no foundation had been laid for the testimony elicited, was of itself grossly prejudicial to the defendants and reversible error.

We do not see how the defendants could have been prej-

udiced by anything that occurred relating to the revolvers or in connection with the revolver expert as a witness.

When Shapiro was cross-examined by the defendants' counsel he gave testimony as follows: " I know Mr. Marshall, the attorney for Sullivan. I did not say to Mr. Marshall anything about the occupants of this car. I never said anything to him; he asked me who I had in the car that night and if I knew the men and I said ' yes; ' he didn't ask me no names or nothing. He didn't ask me who was in—he said if I knew the men and I did not tell him. Vallon was in the car that night. Vallon went with me all the way up to the Seventh avenue house from Fourteenth street. When I got to the Seventh avenue house Schepps left the car; Vallon and Rose stayed in the car."

Marshall was subsequently called as a witness by the defendants and he was asked about a conversation with Shapiro which took place about a week before the termination of the Becker trial. The district attorney said that he would object to any question relating to the conversation for the reason that Shapiro's attention was not called to such conversation. The record of what then occurred is as follows:

" Q.   Did Shapiro state to you at that time who the occupants of the car were?   [Objected to; sustained; exception.]

" Mr. Wahle:   I drew the attention of Shapiro to that.

" The Court:   That precise question?

" Mr. Wahle:   That is the thing I am referring to.

" By Mr. Wahle:

" Q.   Did he state to you that among the occupants of the car were Schepps and Vallon?   [Objected to.]

" The Court:   Was that direct question asked Shapiro?

" Mr. Wahle:   Yes.   I do not know the page.   I know what I asked about.

" The Court:   I will take your word for it, and overrule the objection.

" The witness: May I have the question read?

" The question is repeated by the stenographer as follows: ' Did Shapiro state to you at that time who the occupants of the car were? '

" A. He did.

" Q. Did he state the occasion upon which Schepps and Vallon were the occupants of the car. [Same objection; sustained; exception. No cross-examination.]

" Mr. Wahle: One moment.

" The Court: No; nothing further.

" Mr. Wahle: I take an exception."

The testimony of Marshall was only admissible to contradict Shapiro. To make the testimony admissible for the defendants Shapiro's attention should have been called directly to the question upon which the defendant's counsel proposed to contradict him. Shapiro was never asked the direct question that was asked of Marshall. In fact there is grave doubt whether the testimony of Shapiro, that we have quoted, has any reference at all to the occupants of the car when it went from Forty-second street and Sixth avenue to the scene of the homicide or on the trip immediately following the homicide.

The defendants' right to have Marshall answer the question, the answer to which was excluded, was not sufficiently clear for the reasons stated on which to base the defendants' claim of reversible error.

We have examined every ruling adverse to the defendants upon the receipt or exclusion of evidence, and also particularly such parts of the record as show according to the defendants that the court was prejudiced against them and manifested such prejudice to their injury, but we do not think that unfairness or reversible error were shown.

We have also examined with care the opening address by the assistant district attorney and the address to the jury by

counsel for the defendants and the prosecution, respectively, and notwithstanding the criticism of counsel for the defendants we do not think that it is necessary to quote therefrom or comment thereon in detail. We do not think that the assistant district attorney violated the bounds of propriety or legal right either in the opening address or in his presentation of the case to the jury. The testimony was complicated and it was the duty of counsel for the prosecution, as well as for the defendants, to discuss the same from their respective standpoints, and in doing so unless statements were made that could not have been corrected if attention had been called thereto on the submission of the case to the jury by the court, any alleged misunderstanding arising from such statements so acquiesced in ought not to affect the result.

Counsel has called attention to inferences drawn from the testimony by the assistant district attorney that are directly opposite to the alleged necessary inferences drawn from the same facts by counsel for the defendants. It is clear that counsel for the defendants did not at the time consider that injustice was being done to his clients by the assistant district attorney; neither did he at the time think that the court had acted in a prejudicial manner towards them. In his final address to the jury, referring to the defendants, he said: "For the first time in their lives they have been in a court room where a district attorney has on cross-examination spoken to them in considerate tones and not bully-ragged them or bull-dozed them. Probably for the first time in their lives they have been before a jury who have listened to their story and not treated them with contempt, and I venture the statement that probably for the first time in their lives they have been before a judge who has spoken kindly and gently to them and treated them kindly and gently and has not treated them as if they were the outcasts of the world. That is something new in their lives."

At the close of the address of the assistant district attorney, counsel for the defendants said: " If your honor please, there are a number of statements in the summing up of counsel, particularly some in the peroration to which under ordinary circumstances I should like to take an exception, but I feel *that I can safely conserve these defendants' rights if your honor will permit me to send to you three additional requests to charge that I think will cover the situation.* May I have that permission? " The court granted the permission and adjourned court until the following morning when the charge of the court to the jury was delivered.

At the close of the charge of the court no exception of consequence was taken to it by the alert and able counsel for the defendants. The language of this court in People v. Pallister (138 N. Y. 601, 603) is applicable in this case, wherein it says: " But it may be observed very properly, the absence of an exception upon the trial, where the accused has been defended by counsel known to be able and experienced, deprives the argument of much force, which seeks to assail in this court the correctness of some part of the proceedings."

Counsel for the defendants had previously submitted sixty-eight requests to charge, many of which were fully covered by the court in the main charge, and he was permitted to submit nine further requests to charge. The first of the nine additional requests to charge was as follows: " The jury in this case are not concerned with the result of the trial of any other person mentioned in this indictment. These defendants may be innocent of the crime charged against them and yet others mentioned in this indictment be guilty; and the fact that the jury may know the result of the trial of Charles Becker, co-defendant herein, must in no way affect them in the determination of the questions in this case, as the innocence or guilt of these defendants is to be determined only by the evidence here presented."

To this request the court said: "I refuse to charge that request in the language presented, but will charge it in part, that the innocence or guilt of the defendants must be determined solely upon the evidence before the jury irrespective of any knowledge the jurors may have of the result of the trial of Charles Becker."

The third request was as follows: "The case is not to be determined upon the opening addresses of the district attorney or counsel for the defendants. It is the evidence in the case which is to receive the attention of the jury."

The court: "I charge that, but I add to that, that the arguments of counsel when based upon the evidence are also to receive adequate attention from the jury."

The fourth request was as follows: "The jury will disregard all references to the character or fate of one Jack Zelig; he is not a party to this indictment and is not concerned with the issues in this case, excepting so far as he is involved in the interviews that were had by Jack Rose with these defendants and the relation of the defendants with said Jack Zelig."

The court in response to the fourth request said: "I decline to charge in the language presented, as it is incomplete or misleading, but I will charge part of the request, namely, that the jury must not take into consideration the fate of Jack Zelig."

The court ruled upon the other written requests submitted to him and an exception was taken to those not charged. The counsel for defendants referring to the statements made by the court in the main charge said: "I ask your honor to charge the jury so far as the skeleton of the evidence of the prosecution and defense is concerned if the recollection of the jury as to the evidence differs from that which your honor has embodied in the skeleton then the recollection of the jury must control and not your honor's recollection."

To this request the court replied: "I so charge and I say

in general that if at any time during my charge I have inadvertently fallen into any error or mistake, touching the evidence or the testimony of any witness, it is your recollection, gentlemen, that must control and not mine."

We do not find any error of law that requires a reversal of the judgment against the defendants, or either of them, nor do we find any unfairness toward the defendants that makes a new trial necessary in the interest of justice.

The judgment of conviction should be affirmed.

MILLER, J. (concurring). I concur in the opinion of my brother CHASE for the affirmance of this judgment, but I should not do so if the verdict depended upon the testimony of Rose, Webber, Vallon and Schepps. Four other witnesses positively identified one or more and together they identified all of the defendants as participants in the actual shooting of Rosenthal. Three of the defendants were confessedly at the scene of the murder and the story as related of the fourth coming down town and returning just before the murder without accomplishing his alleged purpose is improbable. The explanation given by the defendants of their coming to Webber's poker room just before the murder and of the admitted presence of three of them at the murder is, if possible, more difficult to believe than some of the testimony of Rose, Webber, Vallon and Schepps. The foregoing considerations, together with the fact of the flight and concealment of the defendants after the commission of the crime, leave no doubt in my mind of their guilt.

WERNER, WILLARD BARTLETT, HISCOCK, COLLIN and CUDDEBACK, JJ., concur with CHASE, J.; MILLER, J., concurs in memorandum.

Judgment of conviction affirmed.