# COURT OF APPEALS,

## May, 1915.

## THE PEOPLE v. CHARLES BECKER.

(215 N. Y. 126.)

(1.) MURDER—EVIDENCE—REVIEW BY COURT OF APPEALS.

Extensive as is the power of review vested in the Court of Appeals on an appeal from a judgment of death, the law does not intend to substitute the conclusions of fact which *may* be drawn from the evidence by seven judges for the conclusions of fact which *have* been drawn from the evidence by twelve jurors, unless it is clear that the view of the facts taken by the jury is wrong. It is the duty of the court to affirm, if the trial was fair and without legal error and the verdict was not against the weight of evidence.

(2.) SAME—FOOLISH OR BLUNDERING CONDUCT ON PART OF ACCUSED.

An argument upon a trial for muder that it is impossible to believe that defendant would have been so foolish as to order or induce the murder to be committed at a time when he himself would almost certainly be the one man who would be suspected of complicity therein is a proper matter to be considered by the jury. It cannot, however, be laid down as matter of law that a jury is bound to hold that a specified event has not occurred because its occurrence involves unwise or foolish or blundering conduct on the part of the accused person.

(3.) SAME—CORROBORATION OF ACCOMPLICES.

While there can be no conviction of a defendant, charged with murder, upon the testimony of accomplices unless that testimony is believed and is supported by other evidence tending to connect the defendant with the killing, the law does not require that the whole case shall be proved outside the testimony of the accomplices. The "other evidence," required by section 399 of the Code of Criminal Procedure, need only tend to connect the accused with the commission of the offense and it is for the jury to determine whether the corroboration is sufficient to satisfy them of defendant's guilt. (People v. Page, 326, approved and followed.)

162 N. Y. 272, 274, distinguished; People v. O'Farrell, 175 N. Y. 323,

(4.) SAME.

Upon examination of the record and after careful consideration, *held*, that there is evidence therein other than that of accomplices tending to connect the defendant with the commission of the crime.

(5.) SAME—DYING DECLARATIONS.

Upon a trial for murder in the first degree, where the defendant was charged with having induced others to do the actual killing, evidence offered as a dying declaration, that one of the actual murderers who had been theretofore convicted, declared just before his execution that, so far as he knew, the defendant had nothing to do with the killing, was properly excluded. Evidence of dying declarations is not admissible under the law of this state unless the declaration from the victim of the assault, the alleged perpetrator of which is on trial.

(6.) SAME—EXCLUDING JURY FROM COURT ROOM DURING ARGUMENT AS TO ADMISSIBILITY OF EVIDENCE.

A contention that reversible error was committed in excluding the jury from the court room during the argument as to the admissibility of the alleged dying declaration—their exclusion being a violation of the right to a trial by jury guaranteed by the Constitution of the state (Const. art. 1, § 2)—cannot be upheld. The argument related solely to a question of law, determinable by the trial judge, and with which the jury had no concern whatever. While it is never error to permit the jury to be present during the discussion of questions of law by counsel, it was not error to exclude the jury under the circumstances of the present case. (People v. Randazzio, 194 N. Y. 147, distinguished.)

(7.) SAME—WHEN TESTIMONY OF ACTS AND DECLARATIONS OF CONSPIRATORS IN ABSENCE OF DEFENDANT ADMISSIBLE.

Evidence relating to the acts and statements, in the defendant's absence, of persons who conspired with him to commit the murder was properly received under the rule that when a conspiracy is shown, or evidence on the subject given sufficient for the jury, then the acts and declarations of the conspirators, in furtherance of its purpose and object, are competent. (People v. McKane, 143 N. Y. 455, 470; People v. Seidenshner, 210 N. Y. 341, 360, followed.)

(8.) SAME—WHEN TESTIMONY TENDING TO SHOW PAYMENT OF MONEY TO ACTUAL MURDERERS COMPETENT.

Testimony of the widow of one of the actual murderers to the effect that on the evening following the murder her husband brought a package of money to her apartment, where he met the other murderers,

and after a conference with them in an adjoining room the party separated is clearly relevant where there is prior testimony that earlier on the same day one of the conspirators, at defendant's express request, had furnished money to pay the murderers, which had been handed over to the witness' husband. Where a conspiracy to kill involves the employment of hireling murderers, the proof is not necessarily so limited as to exclude all evidence of occurrences after the killing. The fulfillment of the agreement by the subsequent payment and receipt of the sum agreed upon is a relevant fact and, therefore, properly provable.

(9.) SAME—EVIDENCE REVIEWED AND HELD SUFFICIENT TO WARRANT SUBMISSION TO JURY.

Upon review of the record and of the specific points for the appellant as they are stated in the brief of his counsel, *held*, (1) that the rules of law required the submission of the issues of fact to the jury; (2) that the case was fairly and impartially tried; (3) that no errors of law were committed prejudicial to the defendant; and (4) that the verdict cannot be deemed to be against the weight of evidence or against law within the meaning of section 528 of the Code of Criminal Procedure. There being sufficient evidence in quantity and quality to take the case to the jury, their verdict, in the absence of any of the statutory grounds for reversal, is conclusive.

(10.) SAME—ADMONITION TO JURY TO AGREE.

An earnest admonition to a jury to come to an agreement is neither improper nor unusual.

(11.) SAME—CODE CRIM. PRO., § 465, SUBD. 7.

The court may not grant a new trial under the provisions of the Code of Criminal Procedure relating to newly-discovered evidence (§ 465, subd. 7) where the freshly-proffered proof goes simply to impeach or discredit a witness sworn upon the first trial.

(Argued March 24, 1915; decided May 25, 1915.)

APPEAL from a judgment of the Supreme Court rendered May 29, 1914, at a Trial Term for the county of New York upon a verdict convicting the defendant of the crime of murder in the first degree. Also appeal from an order of said court, entered February 26, 1915, denying defendant's motion for a new trial on the ground of newly-discovered evidence.

The facts, so far as material, are stated in the opinion.

*Martin F. Manton, William H. Griffin* and *John B. Johnston* for appellant.

Defendant's guilt was not established beyond a reasonable doubt but the verdict is against the overwhelming weight of the evidence and is thus contrary to law. (People v. Fitzgerald, 156 N. Y. 263, People v. Patrick, 182 N. Y. 131; Moller v. Moller, 115 N. Y. 466; Matter of Cross, 85 Hun, 357; People v. Ledwon, 153 N. Y. 10; People v. Razezicz, 206 N. Y. 249.) The prosecution having failed to establish defendant's guilt beyond a reasonable doubt, the verdict of guilty, being hopelessly against the weight of the evidence, is contrary to law and cannot stand. (People v. Corey, 157 N. Y. 332; People v. Farmer, 196 N. Y. 65; People v. Ledwon, 153 N. Y. 10; People v. Raffo, 180 N. Y. 434.) The conviction was had upon testimony of accomplices without corroboration by any other evidence tending to connect defendant with the commission of the crime, and is thus contrary to law. (People v. Farrell, 175 N. Y. 323; People v. Page, 162 N. Y. 272; People v. Kathan, 136 App. Div. 303; People v. Plath, 100 N. Y. 590; People v. Bissert, 71 App. Div. 118; People v. Butler, 62 App. Div. 508; People v. Courtney, 28 Hun, 589; People v. Josephs, 143 App. Div 534.) The admission of the alleged statement of Dago Frank in the hearing of Shapiro, just before the murder, in defendant's absence, was highly prejudicial and constitutes reversible error. (People v. Kathan, 136 App. Div. 303; Ormsby v. People, 53 N. Y. 472; People v. Friedman, 205 N. Y. 161; People v. Conrow, 200 N. Y. 356; People v. Koerner, 154 N. Y. 355; People v. Razczicz, 204 N. Y. 249; People v. Smith, 172 N. Y. 210; People v. Helmer, 154 N. Y. 596; Coleman v. People, 58 N. Y. 555.) The rulings of the court on the cross-examination of Rose, in declining to strike out answers not responsive to the questions, and in excluding evidence which would establish that Rose changed his testimony on this trial

about alleged conversations over the telephone in order to over-come the criticisms of this court on the former appeal, were erroneous and highly prejudicial to defendant. (Cannon v. Fargo, 138 App. Div. 20; 147 App. Div. 51; 158 App. Div. 290; Brennan v. City of New York, 130 App. Div. 267.) The admission of self-serving declarations of Webber to the district attorney in defendant's absence and after the murder was re-versible error. (People v. Schlessel, 196 N. Y. 476.) The admission of the testimony of Lefty Louie's widow of an alleged conversation, which she claims to have overheard between Rose and Lefty Louie, in defendant's absence, was highly prejudicial and constitutes reversible error. (People v. Kathan, 136 App. Div. 303; Ormsby v. People, 53 N. Y. 472; People v. Friedman, 205 N. Y. 161; People v. Maine, 166 N. Y. 50.) The admission of the testimony of Lefty Louie's widow, of alleged occurrences in her Seventh avenue apartment, on the evening after the murder, in defendant's absence, respecting a division of money among the gunmen, was highly prejudicial, and constitutes reversible error. (People v. Razezicz, 206 N. Y. 270.) The admission of anoymous complaints received at police head-quarters, charging defendant with protecting Rosenthal's gambling house and receiving money for such protection, was highly prejudicial, and constitutes reversible error. (People v. Freedman, 203 N. Y. 267; People v. Fitzgerald, 156 N. Y. 253.) The exclusion of the dying statement of Dago Frank to Father Cashin, Thomas F. McInerney and his mother and sister, all present with him, immediately before his electrocu-tion, that so far as he knew defendant had nothing to do with the murder, was highly prejudicial and constitutes reversible error. (People v. Falletto, 202 N. Y. 494; People v. Schiavi, 96 App. Div. 479; Donnelly v. United States, 228 U. S. 243; People v. Giro, 197 N. Y. 152.) The exclusion of the jury from the court room, over defendant's objection, during defendant's offer of proof of the Dago Frank confession, and the discussion

of its admissibility, was reversible error. (People v. Cancemi,. 18 N. Y. 128; People v. Randazzio, 194 N. Y. 147; Maurer v. People, 43 N. Y. 1; People v. Palmer, 43 Hun, 397.) The exclusion of testimony ·from the auditor of disbursements of the district attorney's office, which would have established that Moe Cohen, a material witness whom the People failed to call, had been drawing a salary from the district attorney's office and was under the district attorney's control, was highly prej-· udicial to defendant and constituted reversible error. The ex-· clusion of similar testimony respecting Schepps was also errone- ous. (People v. Leonardo, 199 N. Y. 432.) The court erred in refusing to permit defendant's counsel to frame questions to·· People's witness Rose in the identical form which was allowed to the district attorney in his cross-examination of defendant's witnesses, thus depriving defendant of a scrupulously fair and impartial trial. (People v. Criscuoli, 164 App. Div. 119.) The flagrant and repeated injection of incompetent, extraneous. matters, unsupported by any proof, into the case, by the dis- trict attorney in his opening and summing up, and throughout the course of the trial, were highly prejudicial to defendant and deprived him of a scrupulously fair and impartial trial. (People v. Wolf, 183 N. Y. 464; People v. Fielding, 158 N. Y. 542; People v. Smith, 162 N. Y. 520; People v. Hinksman, 192 N. Y. 421; People v. Mull, 167 N. Y. 247; People v. Pisano, 142 App. Div. 524; People v. Smith, 55 App. Div. 368; People· v. Greenwall, 115 N. Y. 520; People v. Smith, 182 N. Y. 210;· People v. Wennerholm, 166 N. Y. 582; People v. Helmer, 154 N. Y. 596; People v. Cascone, 185 N. Y. 317.) The charge· was unfair, erroneous and highly prejudicial in many respects. (People v. Razezicz, 206 N. Y. 249; People v. Barberi, 149 N. Y. 256; People v. Tuczkewitz, 149 N. Y. 240; Allison v. United States, 160 U. S. 203; People v. Barone, 161 N. Y. 451; People v. Speski, 57 App. Div. 91.)

*Charles Albert Perkins, District Attorney (Robert C. Taylor of counsel), for respondent.*

The corroboration of the accomplices was sufficient. (People v. Conroy, 97 N. Y. 62; People v. Place, 157 N. Y. 584; People v. Willett, 213 N. Y. 368; People v. Hooghkerk, 96 N. Y. 149; People v. Ammon, 92 App. Div. 205; 179 N. Y. 540; People v. Ryland, 97 N. Y. 126; 28 Hun, 568; People v. Jaehne, 103 N. Y. 182; People v. Everhardt, 104 N. Y. 591; People v. Elliott, 106 N. Y. 288; People v. Terwilliger, 142 N. Y. 629.) Defendant's contention that the district attorney " staged " this trial in such a way that the defendant was prejudiced from the outset cannot be sustained, in view of the fact that defendant's counsel, at the trial, expressed appreciation of its fairness. (People v. Cummins, 206 N. Y. 283; People v. Seidenshner, 210 N. Y. 341.) Objections that matters were permitted to be proved that happened in the absence of the defendant are frivolous. (People v. Seidenshner, 210 N. Y. 341.) Mrs. Rosenberg's testimony as to the division of the money was relevant. (People v. Storrs, 207 N. Y. 147.) The anonymous letters were an inseparable part of the history of the case, and, as such, were properly received. (People v. Willett, 213 N. Y. 368; Lawlor v. Loewe, 235 U. S. 522.) There was no error in limiting the scope of Rose's cross-examination. It is well settled that the extent of cross-examination is discretionary with the trial judge. (G. W. Tpk. Co. v. Loomis, 32 N. Y. 127; White v. McLean, 57 N. Y. 670; Langley v. Wadsworth, 99 N. Y. 61; People v. Braun, 158 N. Y. 558.) The trial court properly excluded Dago Frank's dying statement. (People v. Greenfield, 85 N. Y. 75; Brown v. State, 37 L. R. A. [N. S.] 345; Donnelly v. United States, 228 U. S. 243; People v. Hall, 94 Cal. 596; Tillman v. State, 166 S. W. Rep. 582; Snow v. State, 58 Ala. 375; People v. Davis, 56 N. Y. 95.) The exclusion of the jurors from the court room was proper. (People

v. Smith, 104 N. Y. 491.)   Reversible error cannot be predicated on alleged misconduct of the district attorney.   (Chesebrough v. Conover, 140 N. Y. 382; Cattano v. M. S. Ry. Co., 173 N. Y. 565; Schultze v. Huttlinger, 150 App. Div. 489; People v. Collins, 206 N. Y. 668; People v. Muehlfeldt, 200 N. Y. 550; People v. Doody, 177 N. Y. 165; People v. Wagner, 180 N. Y. 58; People v. Smith, 180 N. Y. 125; People v. Gillette, 191 N. Y. 107; People v. Poulin, 207 N. Y. 73; People v. Cummins, 209 N. Y. 283; People v. Hartigan, 216 N. Y. 144.)

WILLARD BARTLETT, Ch. J.:

The principal appeal brings up for review the second trial of Charles Becker for the murder of Herman Rosenthal.   The homicide occurred shortly before 2 o'clock A. M., on the 16th day of July, 1912, when the victim was shot to death on the sidewalk in front of the Hotel Metropole on West 43rd street near Broadway.   Four men were actually concerned in the fatal shooting, namely, Jacob Seidenshner, Frank Cirofici, Louis Rosenberg and Harry Harowitz—better known to their associates respectively as Whitey Lewis, Dago Frank, Lefty Louie and Gyp the Blood—and frequently referred to for convenience as the gunmen.   They have all been convicted and have suffered death for their crime.   (People v. Seidenshner, 210 N. Y. 341, 31 N. Y. Crim. 176.)   They were hired to kill Rosenthal by three professional gamblers known as Jack Rose, Bridgie Webber and Harry Vallon, who turned state's evidence and testified not only against the gunmen but also against the defendant Becker, under a promise of immunity from the district attorney, given with the sanction of the court.   Rose, Webber and Vallon claim to have acted at the instance of Becker in thus bringing about the death of Rosenthal; and the public prosecutor appears to have considered that the community would gain more by the conviction of a faithless public officer

than it would suffer by the escape of three confessed murderers from any punishment for their participation in the crime. This was a matter for him to determine under the responsibility of his official oath; and with the exercise of his discretion in this respect, this court has nothing to do.

The first judgment of death against the defendant was reversed because he did not have a fair trial. The judgment now under review is not assailable on that ground. This I shall endeavor to show as I proceed to discuss the principal points presented in behalf of the appellant.

On the first appeal the court expressly refrained from considering and passing upon the question whether the verdict was against the weight of evidence. While the prevailing opinion did consider at length the evidence and point out what seemed to be various weaknesses and defects in the People's case, this was done simply for the purpose of leading up to and emphasizing the proposition that under such circumstances the appellant was entitled to a scrupulously fair trial, and it being decided that he did not have this, it became unnecessary to consider the other question of the weight of evidence which is now presented to us.

The composition of the briefs illustrates the comparative importance which is attached to the power of the Court of Appeals to deal with the facts in reviewing a capital case. Of the 540 pages which make up the brief for the appellant, 391 pages are devoted to a consideration of the facts; while 111 pages are occupied by a discussion of the facts in the district attorney's brief of 180 pages.

The facts of the crime as developed by the evidence on both sides were elaborately set forth in the opinion of this court on the first appeal (People v. Becker, 210 N Y. 274, 30 N. Y. Crim. 452); and also in the case of the gunmen (People v. Seidenshner, 210 N. Y. 341, 31 N. Y. Crim. 176). It is unnecessary, therefore, to restate them in detail here. It was the

theory of the prosecution that Rosenthal and the defendant had been associated in the business of gambling; that the defendant had loaned Rosenthal money to be used for their joint benefit in the conduct of a gambling house; that the existence of this gambling house became known to the police authorities so that it was necessary for the defendant, as head of the special squad engaged in the suppression of gambling, to make a raid upon the establishment; that Rosenthal was angered by the raid and a state of enmity arose between them which led him to threaten disclosures to the district attorney and the police commissioner which would have caused the defendant to lose his position. In other words, the motive ascribed to the defendant for desiring the death of Rosenthal is the defendant's dissatisfaction at Rosenthal's conduct in regard to their joint gambling enterprise and his apprehension that if Rosenthal lived he would reveal misconduct on the part of the defendant which would inevitably result in his ruin.

It was, and is, contended in behalf of the defendant that sentiments of enmity against Rosenthal were entertained by Rose, Webber and Vallon which were sufficient to account for their action in hiring the gunmen to kill the gambler, irrespective of any hostility to Rosenthal on the part of Becker. The contention of the defense in this respect was clearly presented to the jury in the charge of the learned trial judge; and the verdict shows that they must have rejected it.

As has often been said, proof of the existence of a particular motive is not essential to establish the guilt of a person accused of crime; but when the existence of a particular motive is suggested it becomes exceedingly important to inquire as to the probability or possibility of its having been the actuating cause of the crime. A cogent argument in favor of the defendant in this respect merits consideration. It is said that, inasmuch as Rosenthal had just taken steps to make public his charges against the defendant by offering them to a prominent New

York newspaper, Lieutenant Becker must have known that any attack upon Rosenthal at that time would almost certainly be attributed to his agency; and, therefore, that a man of his intelligence, however inimical he might be to Rosenthal, would not have permitted a murderous assault upon him at a juncture when the circumstances would almost unerringly point to him as the author of the crime. The sum and substance of the argument is, that it is impossible to believe that Becker would have been so foolish as to order or induce the murder to be committed at a time when he himself would almost certainly be the one man in the city of New York who would be suspected of complicity therein.

This was a proper matter to be considered by the jury and we must assume that they considered it. It cannot be laid down as matter of law that a jury is bound to hold that a specified event has not occurred because its occurrence involves unwise or foolish or blundering conduct on the part of the accused person. Indeed, the propensity of criminals to blunder has long been recognized as a characteristic of great value in the detection of crime. The criminal reports of England and this country are full of cases in which guilt has been fastened upon the defendant by reason of the omission of some slight precaution or the commission of some apparently insignificant act which would have seemed almost impossible in the case of a person of ordinary common sense.

Extensive as is the power of review vested in this court on an appeal from a judgment of death, the law does not intend to substitute the conclusions of fact which *may* be drawn from the evidence by seven judges for the conclusions of fact which *have* been drawn from the evidence by twelve jurors, unless we are clear that the view of the facts taken by the jury is wrong. It is our duty to affirm, if the trial was fair and without legal error and the verdict was not against the weight of evidence. We are to see to it that the trial was fair and that there

was sufficient evidence, within recognized rules of law, to support the verdict; this done, the responsibility for the result rests with the jurors.

Guiding our action by these established principles of criminal procedure in capital cases, we do not feel justified in interfering with the verdict.

The case as presented upon the second trial differed materially from the case as presented upon the first. The actual killing of Rosenthal by the gunmen was not controverted, nor was the agency of Rose, Webber and Vallon in employing them. The question was who instigated Rose, Webber and Vallon to cause the murder to be done. Were they moved to act by the fraternity of New York gamblers largely represented on the Sam Paul excursion, who dreaded the destruction of their business by Rosenthal's threatened disclosures, or did they hire the gunmen to shoot Rosenthal at the instance of Lieutenant Becker? There is nothing to indicate that the gunmen were actuated by any personal hostility toward the man they killed. They were simply murderers for hire. Rose, Webber and Vallon admit their own complicity in the crime but claim to have been set in motion by Becker. Upon the truth or falsity of their testimony to this effect depends the guilt or innocence of the defendant.

Being clearly accomplices as matter of law (as the court correctly charged), it was necessary, in order to warrant a conviction upon their testimony that it should be corroborated by other evidence tending to implicate the defendant in the murder. "A conviction cannot be had upon the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the crime." (Code Crim. Pro. § 399.) Accordingly, the trial judge properly instructed the jury as follows: "If the jury find that the testimony of Rose, Vallon and Webber has not been sufficiently corroborated so as to connect this defendant

with the commission of the crime, or if the jury disbelieve the testimony of Rose, Webber and Vallon in its main essential features, they must acquit this defendant."

We are thus brought to a consideration of one of the most important questions presented by the appeal: Was there sufficient corroboration to take the case to the jury? There could be no conviction of the defendant unless the jury believed the testimony of the three accomplices, nor unless that testimony was supported by other evidence tending to connect Becker with the killing of Rosenthal. But the law does not require that the whole case shall be proved outside the testimony of the accomplices. (People v. Hooghkerk, 96 N. Y. 149, 2 N. Y. St. Rep. 204.) If it did, the testimony of accomplices would never avail anything except as cumulative evidence. The " other evidence " required by the Code need only tend to connect the accused with the commission of the offense. (People v. Ryland, 97 N. Y. 126, 2 N. Y. Crim. 441.) " The law is complied with if there is some other evidence fairly tending to connect the defendant with the commission of the crime so that his conviction will not rest entirely upon the evidence of the accomplice." (People v. Everhardt, 104 N. Y. 591, 594, 6 N. Y. Crim. 231.) If the trial judge is satisfied that there is some such corroboraitve evidence and, therefore, submits the case to the jury, " then it is for the jury to determine whether the corroboration is sufficient to satisfy them of the defendant's guilt." (People v. Elliott, 106 N. Y. 288, 292, 7 N. Y. Crim. 126.) The same view was expressed by this court in People v. Mayhew (150 N. Y. 346, 353, 11 N. Y. Crim. 513), where it was said that under such circumstances the jury " are the sole judges whether the evidence relied upon to corroborate the accomplice is sufficient." In the celebrated Patrick case (People v. Patrick, 182 N. Y. 131, 156, 19 N. Y. Crim. 36) Judge JOHN CLINTON GRAY, discussing the credibility of the accomplice who admitted having administered the fatal dose of

chloroform, said: " It is sufficient if he is corroborated as to some material fact, or facts, which go to prove the connection of the defendant with the criminal intent and its execution. * * * The law, in its humane policy, intends that the life, or the liberty, of an accused person shall not be sworn away by an acomplice, unless the accomplice be so corroborated, as to some material fact, or facts, as that a belief in his credibility becomes reasonable and, therefore, safe to be entertained."

In the brief for the appellant the following sentence, from the opinion in People v. Page (162 N. Y. 272, 274), is quoted in large capitals: " The corroboration must extend to every material fact essential to constitute the crime." The emphasis is misleading, and the rule of evidence set forth in the sentence quoted has no application to such a case as the present. This is pointed out by Judge MARTIN in People v. O'Farrell (175 N. Y. 323, 326, 17 N. Y. Crim. 409). The Page case was an indictment for rape and was controlled by a statute which provided that no conviction could be had upon the testimony of the person injured unsupported by other evidence; while the Code provision operative in the present case prohibits a conviction upon the testimony of an accomplice unless he be corroborated by such other evidence as *tends* to connect the defendant with the commission of the crime. The courts required the corroboration of complainants and accomplices in certain classes of cases before there were any statutes on the subject, and the extent of corroboration differed with the character of the crime. In prosecutions for rape it was early held that a conviction could not be had upon the unsupported testimony of the alleged victims, it being necessary in such cases to prove not only the physical act beyond a reasonable doubt, but also that the complainant was an involuntary participant therein. This rule has been broadened by statute so as to include abduction and other offenses affecting females, and the corroboration

which it prescribes is much stronger than that required in support of the testimony of accomplices. In my judgment the rule which must control our disposition of the question of corroboration in the present case cannot be better stated than it was by Judge MARTIN in the O'Farrell case: " Although under those statutes the rule is different as to the amount of corroboration required, still in either case the corroboration must be of a character and quality which tends to prove the defendant's guilt by connecting him with the crime. If there is evidence fairly tending to show such connection, so that the conviction will not rest entirely upon the evidence of the accomplice, then the question whether the evidence is a sufficient corroboration to induce the jury to find against the defendant is for it to determine; but if there be no evidence tending to connect the defendant with the commission of the crime, a question of law is presented, which is reviewable by this court." (175 N. Y. on p. 326.)

Of course these accomplices were very bad men; accomplices in murder always are; but it is almost a truism in criminal law that if the testimony of bad men were absolutely rejected many murderers would escape the punishment which they deserve. Our statute has safeguarded the defendant who is assailed by such testimony, by prohibiting a conviction upon that alone and by requiring that it shall be supplemented by corroborative evidence pointing to him as the guilty party. The jury were properly warned that in weighing the words of Rose, Vallon and Webber, the fact that these witnesses had been granted immunity, provided they did not actually fire the fatal shots, should be taken into account, and the further fact that they had an interest to shield themselves in the testimony they should give.

After the most careful consideration which I have been able to give the question, I cannot escape the conclusion that there is evidence in the record other than that of the accomplices

tending to connect the defendant with the commission of the crime.

The principal sources of corroboration relied upon by the prosecution were (1) the testimony of the colored man James Marshall as to the presence of Rose at the so-called Harlem conference; (2) the testimony of Deputy Commissioner George A. Dougherty to the effect that the defendant on the 18th of July, 1912, denied that he had seen or heard from Rose since the Thursday or Friday before the homicide (which occurred on Tuesday, the 16th), when he must have known that Rose was then in hiding in the city and was being sought by the police for complicity in the murder; and (3) the testimony of one Charles B. Plitt, a former friend and intimate associate of Becker, who appears to have turned against him since his first trial, to the effect that the defendant expressly warned him before hand to keep away from Times Square on the night when the murder was committed.

The witness Schepps, who was sworn in behalf of the People on the first trial to furnish the necessary corroboration, was not called upon this second trial. The prosecution now relied chiefly upon the evidence of Marshall, Dougherty and Plitt, two of whom had not testified in the case before.

Accepting the testimony of Marshall as true it shows that the defendant and Rose were together at a specified locality in Harlem (124th street and Seventh avenue) on the night of June 27th, 1912, at a time, however, when they might naturally and properly be there—the defendant for the purpose of supervising a raid by his squad upon a negro gambling house in the neighborhood, and Rose on account of his intimacy with Becker and association with him in similar enterprises. The evidence, however, concerning the Harlem conference, as a whole, is much more convicing than it was on the first trial. The date, which was then uncertain, is now fixed as being the 27th of June. Marshall was certainly present at the raid then

made by the defendant's squad; and his presence becomes very significant when considered in connection with Vallon's testimony on the first trial. Vallon then said, in narrating the circumstances of the Harlem conference: "Lieutenant Becker told us he was going to raid a crap game that night, and there was a little colored boy on the other side of the street and he called him over and spoke to him. We stepped aside, Rose and I, and by the time he got finished talking to this boy Webber came along." This mention of the colored boy by Vallon seemed then to be only an unimportant incident of the Harlem conference; but in the light of subsequent developments it tends strongly to prove that Vallon himself must have been there and, therefore, could have participated with the others in the alleged murder plot. It is difficult to see how Vallon would or could have mentioned the colored boy's presence then unless he had himself been present. The defense, by calling three policemen who belonged to the special squad and participated in the Harlem raid, endeavored to prove that Lieutenant Becker did not meet Vallon, Rose and Webber or either of them on that occasion; and yet the fact that Vallon knew the colored boy was there can hardly be accounted for unless Vallon was there himself.

In addition to these considerations it is a matter of importance that there is lacking on this appeal the basis for the severe criticisms which on the former appeal were passed on the People's case in respect of the alleged Harlem conference because of the failure to call the chauffeur who was said to have conveyed some of the conspirators to it. On the first trial not only did the People who knew the identity of this man fail to call him, but it was fairly inferable that his identity had been so obscured that the defense was not afforded an opportunity to call him as a witness. While again on the present trial the People have omitted to call him, it no longer remained true that the defense was prevented by ignorance from placing

him upon the stand. He was known and was within the jurisdiction of the court and could have been summoned as a witness if desired.

The other corroborative evidence is more direct in its implications. There is nothing to impugn the veracity of Police. Commissioner Dougherty. On the second day after the murder this officer interrogated the defendant, his subordinate, as to his knowledge of the whereabouts of Rose, who was already suspected of some connection with the crime. Rose at this time was in seclusion at the house of one Pollak, to which the defendant had sent his lawyer, John W. Hart, together with a notary, to obtain an affidavit from Rose exonerating Becker from any relations with Rosenthal in his gambling undertakings. This affidavit appears in the record and is verified on July 17th, 1912. Notwithstanding these facts the defendant, on the next day, according to the testimony of Mr. Dougherty, told him that he had not any communication with Rose since the 11th of July. As to this incident, the jury were instructed as follows: " If you conclude that this defendant upon being asked by Young or Dougherty as to his knowledge concerning those who committed this murder, made in response to those questions answers which he knew to be false and which tended to show that he had no communication with one of the murderers, then I charge you that you may take into consideration the fact that he did make such false statements, that he did make such false explanation, in determining in connection with all the other evidence in the case, as to the guilt or innocence of this defendant."

The testimony of Plitt implicates the defendant still more directly. He was a newspaper man who had been acquainted with Becker for about four years and was in the habit of seeing him frequently to obtain information about police raids. He met him on the day before the murder and had a conversation with him which he narrates as follows: " Becker told me that

he had received a communication over the telephone from a party named Brown, who was able to obtain an affidavit from one Dora Gilbert, former wife of Herman Rosenthal, which he could use to discredit Herman Rosenthal in the eyes of the public. He said, 'I want you to get several newspaper men and a notary public to obtain this affidavit.' Becker said, 'Just as soon as you have this affidavit signed and sworn to, leave the bunch. Remember who you meet to-night. And where you were. You had better make a memorandum as to your movements so as to be able to prove an alibi; and above all things, keep away from Times Square to-night, and keep that under your belt.' I then asked Becker what I wanted an alibi for; was there anything coming off? Becker said, 'Do as you are told.' I then said, 'You always let me in on everything before. Why not on this? Is it about Herman?' Becker said, 'Perhaps; never mind. Do as you are told. Be able to prove an alibi; you will learn more to-morrow and will then understand."

The witness Plitt gave other testimony in which he attributed incriminating declarations to the defendant; some of these were alleged to have been made on the train on which Becker was taken to Sing Sing after his first conviction. The officers in charge of the prisoner on that occasion, however, deny that he made any such statements in their presence and say that they were with him throughout the trip. This denial enables defendant's counsel to invoke the maxim *falsus in uno falsus in omnibus* as justly applicable to Plitt's testimony; but this maxim is permissive only—not mandatory—and it was for the jury to say how far they would believe him. No satisfactory explanation is given of Plitt's change of attitude toward the defendant, from one of devoted friendship to fatal hostility; but if he is telling the truth now, it makes little difference what the reason is. If the defendant actually cautioned him in advance to be away from the locality of the murder on

the very night when the murder was committed the jury might find that that fact indicated cognizance of a probability at least that something momentous was then likely to occur.

One of the assignments of error most earnestly pressed upon our attention involves a consideration of the law relating to the admission in evidence of dying declarations. Counsel for the defendant offered to prove that one of the gunmen (Cirofici, *alias* Dago Frank) just before his execution at Sing Sing declared that so far as he knew Becker had nothing to do with the killing of Herman Rosenthal. The court sanctioned this offer of proof as a proper method of raising the question and excluded the evidence, to which ruling exception was duly taken.

The admission of proof of the dying declarations of victims of homicide is a well-recognized exception to the general rule excluding hearsay evidence. Sir James Fitzjames Stephen writing in 1882 said he believed this exception was about 100 years old. (1 Stephen's Hist. Crim. Law of England, 447.) It has never been more accurately formulated than it is by the same learned judge in his Digest of the Law of Evidence (Art. 26) where he states it thus:

"*Dying Declaration as to the Cause of Death.* A declaration made by the declarant as to the cause of his death, or as to any of the circumstances of the transaction which resulted in his death, is deemed to be relevant only in trials for the murder or manslaughter of the declarant; and only when the declarant is shown, to the satisfaction of the judge, to have been in actual danger of death, and to have given up all hope of recovery at the time when his declaration was made."

Although at common law dying declarations were admissible only on trials for murder or manslaughter, they have been made admissible by statute in New York in prosecutions for abortion. (Code Crim. Pro. § 398a.) So clearly established was the restriction to cases of homicide that a legislative enact-

ment was deemed necessary to warrant the admission of dying declarations in any other class of cases. (People v. Davis, 56 N. Y. 95.) In the case cited it was held by this court that dying declarations were admissible in cases of homicide only, where the death of the deceased is the subject of the charge and the circumstances of the death are the subject of the dying declarations. To the same effect is the decision of the Supreme Court of the United States in Donnelly v. United States (228 U. S. 243). The declaration must be a statement by the *victim of the crime* (2 Wigmore on Evidence, § 1433; Brown v. Commonwealth, 73 Penn. St. 321; State v. Bohan, 15 Kan. 407; People v. Hall, 94 Cal. 595; State v. Westfall, 49 Iowa, 328); and however cogent may be the reasoning in favor of admitting proof of declarations by any witness about to die and aware of his approaching dissolution, it suffices to say that up to the present time evidence of dying declarations has never been admissible under the law of the state of New York unless the declaration proceeded from the victim of the assault, the alleged perpetrator of which was on trial. Such was not the case as to the alleged declaration by Dago Frank; it was not admissible under any accepted doctrine of the law of evidence; and the learned trial judge would have erred if he had received the proof which was the subject of the offer.

In ruling as he did, the learned trial judge said: " I will exclude it. It seems to me the question is not open under the authorities. If it were open there might be two sides to the question; but I think it is settled." We are virtually asked to re-open it by counsel for the defendant, who argue that the statement of the gunmen immediately prior to their execution was invested with all the solemnity of a dying declaration, and hence by analogy of reasoning should be deemed admissible as such. Speaking of Dago Frank, they say: " In a few moments he would find himself in the realm of the unknown beyond, face to face with his Maker, and wholly ignorant of the penalty or

punishment that might be inflicted upon him for any false statement immediately before his transition. He was in the face of a Great Fear, and all of the secrets of Eternity were soon to be revealed to him. A sense of infinite awe and dread must have pervaded his whole nature."

It is generally believed that a sense of speedily impending death operates to induce one to tell the truth; and we are asked to hold that this influence would be just as effective in the case of any witness who is about to die as it is deemed to be in the case of the victim of a homicide. Whether this view be correct or not, the manner in which the rule as to dying declarations has been dealt with by the courts and the legislature in this state indicates that it may not be broadened except by statute. As to the argument in favor of enlarging it so as to admit evidence of such declarations as that alleged to have been made by Dago Frank, it may be observed that the influence of approaching death might be very different in the case of an innocent victim of crime from what it would be in the case of a guilty murderer condemned to die. Unless numbers of innocent men have suffered capital punishment in this country, many criminals have gone to the gallows with a lie upon their lips. The existing rule, with its strict limitations, has been introduced into India where it appears to have worked badly, according to Mr. Justice Stephen, who says: "I have heard that in the Punjab the effect of it is that a person mortally wounded frequently makes a statement bringing all his hereditary enemies on to the scene at the time of his receiving his wound, thus using his last opportunity to do them an injury. A remark made on the policy of the rule by a native of Madras shows how differently such matters are viewed in different parts of the world. 'Such evidence,' he said, 'ought never to be admitted in any case. What motive for telling the truth can any man possibly have when he is at the point of death.'" (1 Stephen's Hist. Crim. Law of England, 448,

449.) Mention is made of these divergent views merely to show that the admission of dying declarations even to the extent to which they are now received is not universally approved; and the courts should be cautious lest they enlarge the rule by judicial construction.

In connection with the point which has just been discussed, counsel for the appellant insist that reversible error was committed in excluding the jury from the court room during the argument as to the admissibility of Dago Frank's declaration —their exclusion being a violation of the right to a trial by jury guaranteed by the Constitution of the state. (Const. art. I, § 2.) We cannot accede to this view. The argument related solely to a question of law, determinable by the trial judge, and with which the jury had no concern whatever. Every experienced trial judge knows that counsel often inadvertently or purposely introduce into such arguments matters of fact which may affect the jurors when they come to consult upon their verdict. It certainly is not essential and often it is not desirable that they should hear arguments which may serve only to mislead them. While it is never error to permit the jury to be present during the discussion of questions of law by counsel (People v. Smith, 104 N. Y. 491, 5 N. Y. Crim. 161), it was not error to exclude the jury under the circumstances of the present case. Reference is made to the opinion in People v. Randazzio (194 N. Y. 147, 23 N. Y. Crim. 158) as indicating our disapproval of such exclusion, even by consent; but there *evidence which the jury ought to have heard was taken in their absence.* Nothing of the sort happened here; for the outcome of the argument was a decision not to receive the proffered proof.

Of the questions of law in the case, next in importance is the alleged error in the admission of evidence relating to the acts and statements, in the defendant's absence, of persons who are said to have conspired with him to commit the murder.

Shapiro, the chauffeur who drove the car which took the gunmen to the scene of the murder, was allowed to testify, over objection and exception, that as they approached the Hotel Metropole he heard one of the gunmen say: "Leave him turn around; that Becker has the cops fixed up; everything is all right."

This evidence was properly received under the rule explicitly laid down by this court in People v. McKane (143 N. Y. 455, 470; 9 N. Y. Crim. 377) where Judge O'BRIEN said: "When a conspiracy is shown, or evidence on the subject given sufficient for the jury, then the acts and declarations of the conspirators, in furtherance of its purpose and object, are competent, and in a case like this it is not necessary, in order to make such proof competent, that the conspiracy should be charged in the indictment."

All the proof relied upon to establish the alleged conspiracy was not put in until after Shapiro thus testified; but the order in which the evidence might be introduced was a matter within the discretion of the trial judge. When he came to charge the jury in respect to this statement by Shapiro he said: "It became necessary upon the trial that the court should receive that testimony in evidence on the ground that it purported to be a declaration of one of the conspirators who were engaged in the commission of the crime of murdering Herman Rosenthal. But that statement of Shapiro's is not evidence of the truth of the statement contained in it. That is, it is not evidence,—to use his language,—'that Becker has the cops fixed up,' nor is it evidence that 'everything is all right.' The statement of Shapiro's that one of the gunmen used this language is only to be considered by the jury in the event of your concluding that this defendant at the bar did conspire with Rose, Webber and Vallon in order to bring about the assassination of Rosenthal."

Other testimony as to the acts and statements of the ac-

complices in furtherance of the alleged conspiracy was properly received on the same ground. (See opinion of CHASE, J., in People v. Seidenshner, 210 N. Y. at p. 360, 31 N. Y. Crim. 176.)

Particularly strenuous complaint is made, however, of the reception of the testimony of Mrs. Lillian Rosenberg, the widow of one of the gunmen (Lefty Louie), to the effect that on the evening following the murder her husband brought a package of money to her apartment, where he met the other gunmen, and after a conference with them in an adjoining room the party separated. This evidence seems clearly to have been relevant. Rose had previously testified that earlier on the same day Webber, at Becker's express request, had given him $1,000 to pay the gunmen with and he had handed it over to Lefty Louie. It certainly would not be a violent inference from Mrs. Rosenberg's testimony that he divided this blood-money with his associates on the occasion mentioned. Where a conspiracy to kill involves the employment of hireling murderers, the proof is not necessarily so limited as to exclude all evidence of occurrences after the killing. The fulfillment of the agreement by the subsequent payment and receipt of the sum agreed upon is a relevant fact and, therefore, properly provable—just as it would be relevant by way of defense to show that no money had ever been paid to the actual slayers at the instance of the person accused of having procured their employment.

The general and most important features of the case have thus far been discussed. In order, however, to make sure that nothing has been overlooked which the defendant is entitled to have considered, I will now review the specific points for the appellant as they are stated in the brief of his counsel, indicating what seems to me to be the appropriate answer in each instance. This course may involve some repetition, but it is necessary in passing upon a record of this magnitude in a case

argued at such great length, and requiring a careful study of such voluminous briefs.

(I) " Defendant's guilt was not established beyond a reasonable doubt, but the verdict is against the overwhelming weight of the evidence and is thus contrary to law."

This point has been disposed of in the foregoing general discussion of the case.

(II) " The prosecution having failed to establish defendant's guilt beyond a reasonable doubt; the verdict of guilty being hopelessly against the weight of the evidence is contrary to law and cannot stand."

This point is disposed of by the same considerations which apply to point I. In addition, it may be observed, so far as the weight of evidence is concerned, that a number of incidents tending to incriminate the defendant testified to by the witnesses for the People remained without contradiction when the case went to the jury. In his closing address the learned counsel for the defendant said he did not believe that there was any necessity for him to deny the words of Rose and Webber and Vallon and Plitt—thus conceding that the statements of those witnesses were uncontradicted, and relying upon the inherent improbability of their testimony to induce the jury to reject it.

(III) " The conviction was had upon testimony of accomplices without corroboration by any other evidence tending to connect the defendant with the commission of the crime, and is thus contrary to law."

This point also has already been fully covered in the previous part of this opinion. The whole case turns upon it, and the reasons have already been stated which compel the conclusion that the corroboration was sufficient to take the case to the jury.

(IV) " The staging of this second trial in an atmosphere designed to be hostile to defendant was highly prejudicial to

his rights, deprived him of a fair trial and was a flagrant violation of the directions of this court that the defendant should have a scrupulously fair and impartial trial."

This curiously worded point is based upon a number of occurrences just before the beginning of the trial and at its outset. Articles had been published in several New York newspapers accusing the brother of the defendant of having endeavored to induce witnesses to swear falsely upon the trial of the gunmen. It is asserted in the brief for the appellant that certain affidavits in the record "make it a matter of very strong inference that the highly objectionable newspaper accounts emanated from the office of the district attorney." To counteract their effect Mr. W. Bourke Cockran, who then appeared as one of the counsel for the defendant, made a motion that the district attorney be adjudged guilty of contempt of court and asked for a postponement in order that proper papers might be submitted on an application for a change of venue. Complaint is made because these motions were denied. Furthermore, after the trial had been in progress for three days and before the jury had been fully selected, there was published in the New York Commercial Advertiser what purported to be a verbatim report of the district attorney's opening address. Proceedings were taken before Mr. Justice SEABURY against the newspaper corporation, which was duly fined for contempt of court in making this false and premature publication. These contempt proceedings were conducted in the chambers of the justice and, strictly speaking, constituted no part of the trial under review. How any of the matters mentioned could have affected the appellant injuriously or how they constituted any " staging " of the trial prejudicial to his interests it is impossible for me to see. Every juror who sat in the case was pronounced acceptable to the defendant by his counsel and this could hardly have occurred if there had been any impression in his mind that the jurymen had been prejudi-

cially affected by the objectionable publications or the proceedings to punish the offending newspaper. The case would be quite different if the record disclosed any substantial foundation for the suggestion that the district attorney or his agents were responsible in any way for any publications by which it was sought to influence the outcome of the trial. Such misconduct would not only merit the severest reprobation, but would be a good ground for summary removal from office.

(V) " The admission of the alleged statement of Dago Frank in the hearing of Shapiro just before the murder, in defendant's absence, was highly prejudicial and constitutes reversible error."

This point has been already discussed and requires no further consideration.

(VI) " The admission of the alleged conversations between Rose and Rosenthal in the absence of defendant was reversible error."

Proof of these conversations was admissible because there was testimony tending to show that they were subsequently repeated to the defendant, and because there was evidence from which it might be inferred that Rose had previously been authorized by the defendant to talk with Rosenthal in regard to the subject-matter. It is argued that the only proof that Rose was acting as defendant's agent and by his authority in these conversations comes from Rose himself, " and it is a long-established, well-recognized and a salutary rule of law that agency cannot be proven by the declarations of the agent." It is true, of course, that agency cannot be established by proof of the unsworn declarations of an alleged agent; but this does not mean that the sworn testimony of a person claiming to be an agent and tending to prove his authority to act as such is not competent proof of agency. The weight to be given such testimony is, of course, a matter for the jury.

(VII) " The admission of alleged conversations between

Rose and Zelig in the absence of the defendant was reversible error."

The repetition of these conversations to the defendant rendered them admissible.

(VIII) " The admission of alleged conversations between Rose and the gunmen in the absence of defendant was reversible error."

Proof of these conversations was entirely proper in view of the evidence tending to show that Rose in his communications with the gunmen was acting under general authority from the defendant to bring about the death of Rosenthal.

(IX) " The rulings of the court in the cross-examination of Rose, in declining to strike out answers not responsive to the questions and in excluding evidence which would establish that Rose changed his testimony on this trial about alleged conversations over the telephone in order to overcome the criticisms of this court on the former appeal, were erroneous and highly prejudicial to defendant."

The rulings of the learned trial judge on the cross-examination of Rose appear to me to have been extremely fair throughout. If there was an occasional slip in ruling upon questions as to the previous testimony of this witness, any possible error in this respect (and I do not say there was any) was corrected and obviated by the reception in evidence of a transcript of all the testimony given by Rose upon the first trial. This afforded counsel the amplest opportunity to exhibit to the jury any contradictions which appeared between what the witness had previously said and what he said now; and counsel availed himself of this opportunity in the fullest manner by pointing out more than fifty alleged discrepancies.

(X) " The admission of self-serving declarations of Webber to the district attorney in defendant's absence and after the murder was reversible error."

This point, so far as I can appreciate its scope and bear-

ing, relates to the admission of the statement by Webber to the effect that on the day when he changed his counsel he went to the district attorney and told him that he was an accomplice in this murder. He also testified that the counsel whom he discharged was now one of the counsel for the defendant. I am unable to see how these statements could have been in any way harmful to the defendant, inasmuch as it was conceded throughout the trial and is not disputed by anybody that Webber was a participant in the murder. The fact that his former counsel was one of the lawyers representing the defendant on the present trial was immaterial, it is true, but it was expressly conceded to be the fact by Mr. Manton.

(XI) "The admission of the testimony of Lefty Louie's widow of an alleged conversation which she claims to have overheard between Rose and Lefty Louie in defendant's absence was highly prejudicial and constitutes reversible error."

The admissibility of this line of testimony has heretofore .been considered.

(XII) "The admission of the testimony of Lefty Louie's widow of alleged occurrences in her Seventh Avenue apartment on the evening after the murder in defendant's absence, respecting a division of money among the gunmen was highly prejudicial and constitutes reversible error."

This point is also considered elsewhere.

(XIII) "The admission of anonymous complaints received at Police Headquarters, charging defendant with protecting Rosenthal's gambling house and receiving money for such protection, was highly prejudicial and constitutes reversible error."

These anonymous letters were addressed to the police commissioner. They appear to have been referred to the defendant, who subsequently submitted to the commissioner a signed memorandum in reference thereto. The trial judge took pains to instruct the jury that the anonymous letters were not evi-

dence of the facts stated therein but that they were admitted for the purpose of rendering the defendant's memoranda intelligible. This "attempted justification" of the ruling is harshly characterized by defendant's counsel as "most puerile," although in fact it protected the defendant against a possible misapprehension and was in reality of benefit to him. The anonymous letters were properly received as explanatory of the defendant's action and a part of the history of the case.

(XIV) "The admission of conversations between the Police Commissioner and the captain of the precinct in defendant's absence, respecting the stationing and continuance of a patrolman in Rosenthal's place after the raid, was reversible error."

This evidence merely went to show that after the raid upon Rosenthal's gambling establishment a patrolman was kept stationed there, by direction of the police commissioner, until after the murder. The fact does not seem to have been of much importance, and I am unable to perceive how proof of it can have been harmful to the defendant.

(XV) "The exclusion of the dying statement of Dago Frank to Father Cashin, Thomas F. McInerney, and his mother and sister, all present with him, immediately before his electrocution, that so far as he knew defendant had nothing to do with the murder, was highly prejudicial and constitutes reversible error."

This proposition has already been quite fully considered.

(XVI) "The exclusion of the jury from the court room, over defendant's objection, during defendant's offer of proof of the Dago Frank confession and the discussion of its admissibility, was reversible error."

I have previously endeavored to show that the action of the court in this respect was praiseworthy on the part of the trial judge rather than in any manner prejudicial to the defendant.

(XVII) "The exclusion of testimony from the auditor of

disbursements of the District Attorney's office which would have established that Moe Cohen, a material witness whom the People failed to call, had been drawing a salary from the District Attorney's office and was under the District Attorney's control, was highly prejudicial to defendant and constituted reversible error. The exclusion of similar testimony respecting Schepps was also erroneous."

Moe Cohen is a chauffeur, who on the motion for a new trial, reviewed at the same time as the first judgment, made an affidavit denying that he drove a car to the so-called Harlem conference. He was within the jurisdiction immediately prior to the last trial and might have been called as a witness by either party. Enough was proved to enable the jury to infer that the district attorney refrained from calling him because his testimony would have been of no benefit to the prosecution. The further fact that he had drawn money from the district attorney's office was irrelevant, inasmuch as he did not take the stand. The same is true as to Schepps.

(XVIII) "The Court erred in refusing to permit defendant's counsel to frame questions to People's witness Rose in the identical form which was allowed to the District Attorney in his cross-examination of defendant's witnesses, thus depriving defendant of a scrupulously fair and impartial trial."

Under this point some extracts from the record are assembled to show that the district attorney was allowed greater latitude in cross-examination than was accorded to defendant's counsel. These instances, however, are quite exceptional. As has already been intimated, after reading and re-reading every word of the proceedings on this long trial, the resulting impression is entirely favorable to the fairness and impartiality of the trial judge.

(XIX) "The flagrant and repeated injection of incompetent, extraneous matters, unsupported by any proof, into the case, by the District Attorney, in his opening and summing

up, and throughout the course of the trial, were highly prejudicial to defendant and deprived him of a scrupulously fair and impartial trial."

It would unduly lengthen the opinion to discuss in detail the specifications under this point. It must suffice to say that wherever there was any serious departure from the record it was usually promptly checked by the court; and I find no reason to believe that the public prosecutor was permitted to say or do anything which could have had the effect of misleading the jury.

(XX) " The charge was unfair, erroneous and highly prejudicial in many respects."

Counsel denounces the charge as " an animated argument in behalf of the People." Its perusal produced no such effect upon my mind. When I finished reading it I was unable to say whether the learned judge thought the defendant was guilty or not. This ought to be a trustworthy test as to the fairness with which the case was presented to the jury. I can find no error of law either in the body of the charge itself or in the rulings upon the numerous requests.

Upon the oral argument special complaint was made of this passage: " Unless you do your duty, all the labor that has been expended upon this case will have been lost. The district attorney, the counsel for the defense, the court, have all tried to perform their duty to the best of their ability. Let it not be said in this case that the jury neglected to perform the duty which the law casts upon them. I hope you will endeavor to arrive at a conclusion in this case and I trust that the conclusion at which you arrive may be based solely upon the evidence and may be in accord with your conscience and with the law."

Here we have merely an earnest admonition to come to an agreement. Such urgency is neither improper nor unusual.

The assertion that " the facts and law were arrayed and

marshalled in a way highly inimical to defendant's rights and wholly devoid of any serious and anxious desire for their preservation" seems to me to be wholly unwarranted and undeserved—on the contrary, the most sedulous care to preserve the rights of the defendant was manifested not only in the charge but throughout the whole trial.

We desire that the views which lead us to affirm this judgment shall be made unmistakably clear. Doutbless, a very strong argument can be made in favor of the defendant, based upon the inducement of the avowed accomplices to swear falsely, their opportunity to fabricate evidence, and the lack of conclusiveness in the corroboration. All this, however, was a question for the jury with whose determination we are not justified in interfering unless we can say that it was plainly wrong—which, as already stated, we cannot say. Therefore, unless the rules of law which have heretofore governed the disposition of criminal appeals are to be changed merely because there might have been a refusal to convict on this evidence, we think (1) that they required the submission of the issues of fact to the jury; (2) that the case was fairly and impartially tried; (3) that no errors of law were committed prejudicial to the defendant, and (4) that the verdict cannot be deemed to be against the weight of evidence or against law within the meaning of section 528 of the Code of Criminal Procedure. It is not our duty to try the case over again upon the printed record. We have not seen the witnesses. We are deprived of the aid furnished by their appearance, demeanor, facial expression and manner of testifying. These advantages the jury enjoyed; and there being sufficient evidence in quantity and quality to take the case to the jury, their verdict, in the absence of any of the statutory grounds for reversal, is conclusive even upon the Court of Appeals.

As to the appeal from the order denying a motion for a new trial on the ground of newly-discovered evidence, little

need be said. The application was really an attempt to discredit the testimony of the colored vaudeville actor Marshall to the effect that he saw a man whom he subsequently identified as Rose at the Harlem raid. Being intoxicated at Philadelphia, Marshall, under the influence of some newsgatherers, signed and verified a statement somewhat inconsistent with his testimony upon the trial. This statement he now repudiates, as being different from what he understood it to be; and at the close of his affidavit in opposition to the motion he says: " I testified to the truth in everything that I said upon the Becker trial and I do not want to change or take back anything that I have said; and if I am called as a witness again, I will tell the same things because they are true."

The court may not grant a new trial under the provisions of the Code of Criminal Procedure relating to newly-discovered evidence (§ 465, subd. 7) where the freshly-proffered proof goes simply to impeach or discredit a witness sworn upon the first trial. (People v. Priori, 164 N. Y. 459, 15 N. Y. Crim. 194; People v. Eng Hing and Lee Dock, 212 N. Y. 373, 33 N. Y. Crim. ———.) This rule not only justified, but required the denial of the motion.

The judgment of conviction should be affirmed.

HISCOCK, CHASE, COLLIN, CUDDEBACK and CARDOZO, JJ., concur; HOGAN, J., dissents.

Judgment of conviction affirmed.